Michael CATLETT *v.* STATE of Arkansas

CR 96-787 962 S.W.2d 313

Supreme Court of Arkansas
Opinion delivered January 29, 1998

*Craig Lambert*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Gil Dudley*, Asst. Att'y Gen., for appellee.

PER CURIAM. The appellant, Michael Catlett, was convicted of capital murder and was sentenced to life without parole. We affirmed the conviction and sentence in *Catlett v. State*, 321 Ark. 1, 900 S.W.2d 523 (1995). Catlett subsequently sought postconviction relief pursuant to A.R.Cr.P. Rule 37. The Trial Court denied relief. We affirm.

Catlett was charged with capital murder for the shooting death of his former girlfriend, Stephanie Jungkind, on October 1, 1993. To support its theory that the murder was premeditated, the State introduced several witnesses during the trial whose testimony indicated that Catlett harassed Ms. Jungkind during the summer prior to the murder, that he made travel arrangements immediately before the murder, and that he purchased the murder weapon at a local pawn shop. Additionally, the State also used these witnesses, some of whom also testified concerning Catlett's apparently normal behavior during the summer of 1993, to contradict Catlett's insanity defense.

Page Jungkind Oldnettle, Ms. Jungkind's sister, testified that Catlett and her sister had a tumultuous relationship. She stated that after the couple ended their relationship in June of 1993, Stephanie came to live with her and that shortly thereafter, they started to receive several phone calls late at night. Mrs. Oldnettle testified that the caller would frequently hang up, but that sometimes it would be Catlett asking to speak to Stephanie. Mrs. Oldnettle also stated that she called the police on June 16, 1993, when Catlett came to the house, banged on the door, and demanded to see Stephanie.

Mrs. Oldnettle's neighbor, Lisa Cunningham, also testified that on several evenings during the summer of 1993, she would see Catlett's car, a red Honda CRX, driving slowly up and down the street. Ms. Cunningham stated that on these occasions, the CRX would make at least two or three trips.

Kevin King, the manager of a temporary employment agency in Little Rock, testified that Stephanie Jungkind began working

for him on July 23, 1993. He testified that shortly thereafter, his agency began to receive several phone calls from Catlett. Mr. King also testified that he met Catlett when he came to the agency to apply for employment. Mr. King stated that Catlett was dressed in a coat and tie, and that he came prepared with a professional resume.

Victoria Santos was a legal secretary with the law firm where Stephanie Jungkind was placed in August of 1993. Ms. Santos testified that Ms. Jungkind trained at the law firm for one week in the beginning of August, and then returned for an extended period of employment at the end of the month. Ms. Santos stated that after Ms. Jungkind began working at the firm, they started to receive five to ten hang up phone calls a day. Ms. Santos also testified that in the third week of September, 1993, threatening graffiti was drawn in the parking place that was adjacent to the spot where Ms. Jungkind usually parked her car. Ms. Santos stated the graffiti read "Lucifer wants your soul, Stephanie Jungkind bitch." Photographs depicting the graffiti were also introduced during Ms. Santos's testimony.

Michelle McElroy, a deputy prosecuting attorney in Pulaski County, was contacted by the law firm in connection with the graffiti in the parking lot. Ms. McElroy testified that she met with Ms. Jungkind, who told her of the problems she'd been having with Catlett. Ms. McElroy recommended that Ms. Jungkind seek a protective order. Ms. McElroy, for her own part, sent a warning letter to Mr. Catlett. She also testified that she had two telephone conversations with Catlett in which she discussed the harassment, the restitution that must be made to the law firm for the graffiti, and the protective order. Ms. McElroy stated that Catlett seemed "professional" during these conversations.

Tracy Keith, a friend and neighbor of Paige Oldnettle, testified that on a morning shortly before the murder, she saw graffiti on two places on the street. According to Ms. Keith, the graffiti read, in part, "Lucifer is coming for you," and "death takes all souls, Stephanie bitch Jungkind." Steve Keith, Tracy Keith's husband, testified that, in addition to the graffiti that was on their street, he saw similar graffiti in Murray Park.

Other witnesses testified about Catlett's effort to obtain the murder weapon, a Lorcin .380 automatic pistol, approximately two weeks before the murder. Suraj Wagh, one of Catlett's former co-workers, testified that he saw Catlett on September 23, 1993, at a local pawn shop. Mr. Wagh stated that Catlett explained that he was living downtown and wanted to buy a pistol for protection. Mr. Wagh also testified that Catlett appeared tired, but that he seemed "all right, normal."

Dave Niggel is the manager of the pawn shop where Mr. Wagh saw Catlett on September 23, 1993. Mr. Niggel testified that after a long discussion about guns, Catlett decided to purchase a Lorcin .380. Mr. Niggel also testified that Catlett "didn't act fidgety or nervous," and that "he just seemed like a man who wanted to buy a gun." The sale was not completed, however, because Mr. Niggel discovered that Catlett lied on the portion of the federal firearms form that inquired as to whether he had a prior commitment to a mental institution.

Gary Aldrich is the owner of another local pawn shop where Catlett sought to purchase a gun. Mr. Aldrich testified that Catlett "seemed like a nice-looking young man," and that he seemed appropriately oriented to time and place. Mr. Aldrich also testified that Catlett selected a Lorcin .380 automatic handgun, and that the sale was completed after Catlett completed the federal firearms form.

Rita Hawkins testified that she rode with Catlett to a travel agency approximately two weeks prior to the shooting. She stated that Catlett went into the agency for a few minutes and then came back out with an envelope in his hands. Ms. Hawkins testified that she did not see the contents of the envelope.

Christine Rogers testified that she met Catlett on September 14, 1993, and that they dated for two and a half weeks afterward. Ms. Rogers stated that Catlett talked about Ms. Jungkind often, and that he was angry and resentful towards her. Ms. Rogers also testified that she saw the handgun in the glove compartment of Catlett's car. On one of their dates, Catlett told Ms. Rogers that he was manic-depressive and that "someone who is manic-depressive could kill someone and get off on insanity."

Kevin Carpenter, a college friend of Catlett's, testified that he saw Catlett before the shooting, and that Catlett said that he was going to kill Ms. Jungkind. Mr. Carpenter stated that he also saw Catlett on the day of the shooting, and that he did not talk that much, and that he "was in a strange state."

John Dahlstrom testified that on the day of the murder, he and Ms. Jungkind were sitting at the bar at Pizza D'Action in Little Rock when Catlett arrived at the restaurant. It was approximately six-thirty in the evening. According to Mr. Dahlstrom, Catlett sat across from them at the bar and stared at them, and then left. Soon afterward, Mr. Dahlstrom walked Ms. Jungkind to her car. Catlett was still in the parking lot. Mr. Dahlstrom testified that he was the first to leave.

The testimony of several eyewitnesses indicated that Catlett followed Ms. Jungkind to the intersection of Rodney Parham and Mississippi in Little Rock. According to these witnesses, Catlett's car was next to Ms. Jungkind's vehicle at the intersection. Catlett began firing into Ms. Jungkind's vehicle. After the first shot, the pistol jammed. Catlett apparently unjammed the pistol and fired again. The shots struck and killed Ms. Jungkind. After firing the shots, Catlett fled the scene at a high rate of speed and was eventually apprehended by the police.

Detective Joe Leslie of the Little Rock Police Department discussed the incident with Catlett. Detective Leslie testified that Catlett stated that he shot Ms. Jungkind because he was mad at her because she had sued him. Catlett admitted to Detective Leslie that Ms. Jungkind was justified in her actions because he had harassed and stalked her. Catlett also admitted to painting satanic symbols to scare Ms. Jungkind. Detective Leslie added that Catlett was very cool and calm during their conversation, and consequently, the fact that he was a mental patient "struck me like a bolt out of the blue."

At the trial, the facts surrounding the murder were undisputed. Catlett's defense, however, was that his mental illness rendered him incapable of forming the intent required for murder and, in addition, asserted the affirmative defense of not guilty by reason of mental disease or defect.

The first witness called by the defense was Dr. Irving Kuo, the supervising psychiatrist for Catlett during several commitments at the State Hospital. Dr. Kuo testified concerning Catlett's history of treatment for mental health problems. In 1985, Catlett was hospitalized at Tulane Medical Center for overdosing on antidepressant medication. In the Spring of 1991, Catlett was hospitalized at Bridgeway in North Little Rock because he attempted suicide by trying to cut his wrists and by taking an overdose of Tagamet. The discharge diagnosis at that time was alcohol dependence and depression. In the Fall of 1991, Catlett was treated at Baptist Medical Center for overdosing on over-the-counter sleeping pills.

In 1992, Catlett was involuntarily committed to the State Hospital because he was exhibiting very erratic behavior. According to Dr. Kuo, Catlett was grandiose, delusional, and was also hearing voices. The discharge diagnosis from the State Hospital was bipolar disorder, or manic depression, and alcohol dependence. Dr. Kuo characterized Catlett as being "a very disturbed young man" during his stay.

Catlett was again involuntarily committed to the State Hospital in June of 1993. Dr. Kuo stated that Catlett was once again grandiose and delusional, but that he was also violent and "concerned about a recent breakup with his girlfriend." According to Dr. Kuo, Catlett "eloped," or left the hospital, three times during this commitment. Catlett did not return to the hospital after the third elopement. Once again, the final diagnosis was that Catlett was in the manic phase of bipolar disorder, and that he was alcohol dependent.

Walter Catlett, Catlett's older brother, also testified for the defense. Walter testified, as did Dr. Kuo, that Catlett attempted to commit suicide as a freshman at Tulane University in 1987.

Walter, a Marine, stated that duty prevented him from having much contact with his brother until 1991, when he was assigned as a recruiter in Little Rock. Walter testified that at that time, his brother had just graduated from college and was having difficulty finding a job. Walter stated that his brother's difficulty in finding a

position was due to grandiosity, or his belief that he should be hired as the Chief Executive Officer with a six-figure salary.

Walter testified that Catlett was living in Dallas by the Spring of 1992, when Walter paid him a visit. Walter stated that at the time of his visit, Catlett was in an excited state, with accelerated behavior, and that it appeared as though he was spending many hours awake. Walter was later summoned to Dallas by one of Catlett's friends after Catlett was arrested for attempting to steal a Cadillac. Catlett told his brother that he tried to take the Cadillac because he believed it was a gift from Ross Perot. According to Walter, Catlett believed himself to be Mr. Perot's campaign manager. Walter brought his brother back with him to Little Rock and had him committed to the State Hospital for treatment.

Walter testified that Catlett was committed again in 1993. Prior to this commitment, Catlett was seen wearing dirty clothes and carrying a suitcase full of plagiarized poetry that he claimed he authored. Walter also stated that in the Summer of 1993, Catlett would frequently travel to Memphis and that he was "very grandiose."

Chris Stowers, a friend of Catlett's for over ten years, also testified. Mr. Stowers stated that he lived in Memphis during the Summer of 1993, and that Catlett would visit him during his elopements from the State Hospital. Stowers described Catlett as having sporadic thoughts, and Stowers stated that Catlett "was not making much sense. He wasn't Mike." Stowers testified that Catlett, at one point, told him he "could not cope." Stowers, consequently, drove Catlett back to Little Rock and saw him to the State Hospital.

When Stowers returned Catlett's car to him in Little Rock a week later, he found Catlett at his downtown apartment in a disheveled state. Stowers stated that Catlett "was not clean, shaven, or showered," and that "he seemed worse than when I had seen him a week earlier." Catlett was also worried about living downtown, Stowers testified, and that he was contemplating buying a gun for protection.

Stowers testified that two weeks after that encounter with Catlett, Catlett returned to Memphis and stayed with him for ten days. Stowers described Catlett as looking "like he had been on the streets in Memphis." He also stated that Catlett was unable to maintain a coherent conversation, and that "he wouldn't give me any direct answers."

Ellen Nixon, who was the mother of one of Catlett's close friends, also testified. Ms. Nixon stated that she knew Catlett for approximately ten years, and that there was a "definite change" in his behavior during the Summer of 1993. She characterized his behavior as "extreme paranoia." Ms. Nixon testified that Catlett thought planes or helicopters were following him. She also stated that during that summer, Catlett believed he was working for an underground newspaper that was run by someone who was also manic depressive.

The next witness to testify for the defense was Dr. Brad Diner, a psychiatrist from North Little Rock who was hired by the defense to conduct a psychiatric evaluation of Catlett. Dr. Diner testified that he performed the evaluation through three visits in jail with Catlett and a review of his medical records. He also interviewed Walter Catlett and his mother. The first visit with Catlett was in February of 1994. Dr. Diner characterized Catlett's behavior during these visits as "very manic," and "extremely paranoid, pressured and driven." Dr. Diner also testified that he reached the same conclusion as Dr. Kuo when Catlett was previously discharged from the State Hospital — that he could not "function in a manner where he could take care of himself."

Dr. Diner also characterized bi-polar disorder in the following manner:

> Either depressed or manic phases can actually progress to where we have frank psychotic symptoms. That is, symptoms when you're out of touch with reality. That's probably more common in manic states. Manic individuals will elaborate that preoccupation with brilliance, and power and identity into frank, oftentimes bizarre delusions, that is, false beliefs about themselves that are very grandiose. They also become very paranoid.

Dr. Diner added that he believed that Catlett also had a narcisstic personality disorder. The doctor characterized narcisstic individuals as "grandiose," and he stated that such people have greatly inflated self-esteem and are easily hurt and humiliated.

The doctor, at the conclusion of his testimony on direct examination, offered the following opinion: "I believe Michael Catlett was seriously emotionally disturbed the Summer of 1993, up to the time of the shooting on October the first. I believe he was seriously impaired."

On cross-examination, however, Dr. Diner could not say with certainty whether Catlett's behavior met both tests for legal insanity. He stated that at the time Catlett shot Ms. Jungkind, he appreciated the wrongfulness of his conduct, but that it was "difficult to say" whether or not Catlett could actually conform his conduct to the requirements of the law. Significantly, the doctor stated:

> When Michael Catlett shot Michelle Jungkind, he appreciated the wrongfulness of what he did. I believe that he was purposely shooting Michelle Jungkind. It's important to point out that because of his emotional state at that time, he lacked the internal restraints that most of us would have. Because of his impaired state, he could not adequately control himself from or keep himself at that moment from shooting her.

> \*\*\*

> I don't think, without any information otherwise, that how Michael Catlett is in February of 1994 (the date of the first interview) can with any predictive validity determine how he was on October 1, 1993. However, if you see someone who is manic, you can predict that they'll be manic again at some point in their life. We know the possibility of the cycle reoccurring certainly exits, but given time, I don't know and can't predict what it'll be. Whether he'll be up, whether he'll be down, or whether he'll be normal in that functioning range.

> I don't think there is any predictive validity based on the fact that we know that he was having episodes on these previous admissions, '91, '92, '93, how he was on October 1, 1993. I will say that untreated, in Michael's case, in June, he's likely to still be sick in October or December.

*\*\*\**

> I think Michael knew what he was doing was wrong. I think it's real hard to say where he was at that moment with respect to the second prong the jury must consider.

On redirect examination, however, Dr. Diner added:

> Narcisstic individuals can be overwhelmed and react with rage to the humiliation when they feel rejected. I believe that Michael Catlett, being manic on top of that, had elaborated those otherwise narcissistic qualities into frank grandiose delusions with paranoia, and I believe that that only served to escalate his anger more. Because his judgment was so impaired and his impulse control so impaired, he was an accident waiting to happen.

Dr. James Moneypenny, a psychologist, also testified for the defense. Like the other experts, Dr. Moneypenny was of the opinion that Catlett suffered from bipolar disorder, manic type. He testified that individuals in the manic phase of the disorder are delusional, grandiose, and paranoid. Dr. Moneypenny, like Dr. Diner, formed his opinion from interviews with Catlett and a review of his medical records.

Dr. Moneypenny also testified that individuals in Catlett's condition would have impaired judgment and impaired impulse control. He also stated that these impairments "are not an all or none sort of thing. You don't lose all of your judgment all the time, and different patients have different degrees of impairment." Dr. Moneypenny also stated that the symptoms of mental illness, such as depression and anxiety, "in the case of . . . bipolar disorder, and in Michael Catlett's case in particular, . . . are particularly severe." At the conclusion of his testimony on direct examination, Dr. Moneypenny declared, "Michael Catlett was an extremely emotionally disturbed young man in the Summer of 1993, and my opinion is that it continued up until the shooting on October 1, 1993."

On cross-examination, however, Dr. Moneypenny could not offer a definite opinion on whether Catlett's behavior met the legal test for insanity. He testified that he did not interview Catlett until February of 1994, and that neither the interviews or a review of the medical records enabled him to determine Catlett's

condition on the day of the murder "with any predictive validity." As to whether Catlett could appreciate the criminality of his conduct, the doctor testified, "You cannot say for sure exactly what Michael Catlett knew at any given time. . . .My opinion is it could be either way." Dr. Moneypenny did say, however, that it was "an easier case for Michael being unable to conform."

In rebuttal, the State offered the testimony of two witnesses, a psychologist and a psychiatrist. Both testified that Catlett was legally sane at the time of the murder.

In his petition for postconviction relief that was filed in the Trial Court, Catlett made several allegations of ineffective assistance of counsel. Among them was his claim that his counsel was ineffective for failing to have a defense expert examine him at a time that was in closer proximity to the date of the murder. The timeliness of such an examination was important because of the cyclic nature of bipolar disorder. According to Catlett, an examination close in time to the date of the murder would have allowed the experts to determine if he was in a manic phase, and therefore legally insane, at the time of the murder. Catlett contended that as a result of the delay, Drs. Diner and Moneypenny were unable to testify with certainty about whether Catlett met the test for legal insanity. The Trial Court, finding that there was an abundance of evidence concerning Catlett's mental health surrounding the time of the murder, and the fact that Catlett had not shown that an examination closer to that date would have yielded different results, denied the claim. Catlett assigns error to this ruling.

■ ■ To prevail on a claim of ineffective assistance of counsel, the petitioner must show first that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the petitioner by the Sixth Amendment. Second, the petitioner must show that the deficient performance prejudiced the defense, which requires showing that counsel's errors were so serious as to deprive the petitioner of a fair trial. Unless a petitioner makes both showings, it cannot be said that the conviction resulted from a breakdown in the adversarial process that renders the result unreliable. A court must indulge in a strong presump-

tion that counsel's conduct falls within the wide range of reasonable professional assistance. The petitioner must show there is a reasonable probability that, but for counsel's errors, the factfinder would have had a reasonable doubt respecting guilt, i.e., the decision reached would have been different absent the errors. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the trial. In making a determination on a claim of ineffectiveness, the totality of the evidence before the judge or jury must be considered. *Strickland v. Washington*, 466 U.S. 668 (1984). We will not reverse a trial court's ruling on an ineffective assistance of counsel claim unless it was clearly erroneous. *Thomas v. State*, 330 Ark. 442, 954 S.W.2d 255 (1997).

We cannot say that the Trial Court was clearly erroneous for denying relief on Catlett's claim that his counsel was ineffective for failing to have his client examined by defense expert at a time closer in proximity to the date of the murder. During the postconviction hearing, during which Dr. Diner was the only expert to testify, the doctor stated that while he would have preferred to have the opportunity to examine Catlett closer in time to the date of the murder, he was unsure of whether such an examination would have yielded a more definite opinion. The doctor stated:

> I'm not sure if the four or five month lapse of time played a factor in my inability to reach a firm opinion on that second prong of the test for insanity. I think that it could have helped, although I don't know whether or not it would have made a difference. . . . I don't know if my testimony would have been different had I seen Michael a week later, or two weeks later, or three weeks later.

Catlett has not shown that an examination closer in time to the date of the murder would have caused Dr. Diner to testify with any more certainty. Accordingly, he has not shown prejudice under *Strickland* standard.

Furthermore, we note that although both Dr. Diner and Dr. Moneypenny did testify, on cross-examination, that they were unable to determine Catlett's mental state on the day of the mur-

der with certainty, they did testify that he was an extremely disturbed young man during the previous summer, and that persons in his condition, and Catlett in particular, suffer from a loss of impulse control. The testimony of these doctors indicated that an individual in the manic phase of bipolar disorder is typically grandiose, paranoid, and delusional. The doctors' description of these symptoms coincided with the testimony of other defense witnesses who observed Catlett's behavior in the previous summer. Dr. Kuo also testified that Catlett was hospitalized in June of 1993, at which time he was diagnosed as being in a manic phase of bipolar disorder. As can be seen, defense counsel introduced more than enough evidence from which the jury could conclude that Catlett was in a manic phase at the time of the murder, and therefore, legally insane.

Catlett next argues that his counsel was ineffective for failing to introduce the testimony of several lay witnesses who observed his behavior both before and immediately after the shooting. Catlett contends that if this testimony had been available to the jury, they would more than likely have found that he had diminished capacity at the time of the murder. The Trial Court, finding that both the expert and lay testimony presented at trial was adequate to establish that Catlett was behaving abnormally prior to the murder, concluded that there was not a reasonable probability that additional lay testimony would have resulted in a different verdict.

Once again, we cannot say that the Trial Court was clearly erroneous. In his brief, Catlett identifies several lay witnesses that he claims his defense counsel should have put on the stand. We note that defense counsel, during his own testimony, admitted that he did not interview some of these witnesses. For the witnesses he did interview, he articulated the reasons why he chose not to call them during the trial. We have previously held that the decision of whether or not to call a witness is a matter of trial strategy that is outside the purview of Rule 37. *Helton v. State*, 325 Ark. 140, 924 S.W.2d 239 (1996). Accordingly, we must concern ourselves with only those witnesses that counsel admitted he did not interview.

Counsel did not interview the following potential witnesses, all of which Catlett claims could have helped his case: Father George Tribou, Sheila Nixon, and Chanda Calloway. One additional witness, Herb Wright, a local attorney, was never considered a potential witness by defense counsel. At the postconviction hearing, Father Tribou testified that he had four contacts with Catlett in the six months prior to the shooting. He stated that during one of his meetings with Catlett, he was asked to read and critique Catlett's poetry. Father Tribou testified that the poetry was incomprehensible, and as a consequence, he suggested Catlett see a doctor. Father Tribou also stated that he saw Catlett in jail after the murder, and that it appeared that Catlett did not appreciate the gravity of his situation.

Sheila Nixon, Ellen Nixon's daughter-in-law, also testified during the postconviction hearing. Mrs. Nixon stated that she saw Catlett on the weekend prior to the murder, when he came to her home to help paint. She testified that he "looked like a homeless person," and that he was "like a hyperactive child." Mrs. Nixon also testified that Catlett saw faces in swirls of paint on the walls. Lastly, Mrs. Nixon testified that Catlett called her during the week prior to the murder and that his conversation was erratic and unresponsive.

Herb Wright was a friend and local attorney that Catlett called to the jail on the night of the murder. Mr. Wright testified that Catlett would call him during his commitments in the State Hospital and tell him about his painting and poetry writing. Catlett also told him that he was Ross Perot's campaign manager. Mr. Wright also testified that on the night of his visit to the jail, Catlett appeared to not understand of the gravity of his situation, and that he appeared uncharacteristically "flat," or unemotional.

Chanda Calloway testified that she and Catlett had been friends a long time, and that they dated briefly in high school. Ms. Calloway stated that in the spring and summer prior to the shooting, Catlett exhibited unusual behavior — that he dressed oddly, talked erratically, and seemed paranoid. He told her that he was Ross Perot's campaign manager.

We conclude that counsel did not perform deficiently by failing to interview these witnesses and introduce their testimony during the trial. As can be seen, their testimony is cumulative of the testimony of the defense experts and the other lay witnesses. Accordingly, there is not a reasonable probability that their testimony would have changed the outcome of the trial.

Catlett next argues that his counsel was ineffective for failing to call Wag Woodward, a friend and local landlord, to testify during the trial. According to Catlett, Woodward would have testified that on the day of the shooting, Catlett met with him and discussed renting an apartment. Catlett contends that such testimony would have rebutted the State's evidence that he intended to flee, thereby undermining the theory that the murder was committed with premeditation and deliberation. He argues that he was prejudiced by the failure to call Mr. Woodward as a witness because the rebuttal of the evidence of premeditation and deliberation would have led to at least a conviction on a lesser degree of murder.

At the postconviction hearing, Mr. Woodward testified that he has known Catlett since 1979. Mr. Woodward stated that he is the landlord for property that his parents own in the Quapaw area of Little Rock. Catlett called one of his property managers the day before the shooting to arrange to look at an apartment. Mr. Woodward met him personally at noon on the day of the shooting.

Mr. Woodward testified that he visited with Catlett for about an hour, and that Catlett decided to rent the apartment, and indicated that he wanted to move in that weekend. Mr. Woodward testified that Catlett's demeanor was "in between normal and out of the ordinary. He seemed like the Michael Catlett I've always known." Mr. Woodward added that he did not recall ever being contacted by Jack Lassiter or any member of his staff.

Defense counsel testified that he did not personally interview Mr. Woodward. He also stated that while there were notes in his file indicating that Mr. Woodward had been interviewed, he did not know their source. He then conceded that he could not make a tactical decision not to use a particular witness unless he inter-

viewed the witness. Defense counsel added, however, the following:

> Yes, I felt that if I had continued to call additional lay witnesses, I may have incurred liability. I wouldn't throw somebody up there, for example, that'd seen him two hours earlier when he was functioning normally and talking to him about renting an apartment, talking about going to school up at the university, and talking about his .380 semiautomatic. I wasn't going to put that person up there, 'cause he's not acting crazy. He's acting normally. The notes in my file indicate that (Woodward) would testify to that.

> \*\*\*

> Yes, any decision to call somebody such as Woodward would have been at least uneventful as far as I'm concerned from a defense perspective, and potentially counterproductive based on the notes I had in my file.

In its findings of fact and conclusions of law, the Trial Court noted that defense counsel did not interview Mr. Woodward. The Trial Court denied relief on the ineffective assistance of counsel claim, however, because the effectiveness of Mr. Woodward's testimony in rebuttal of the State's theory of premeditation was "purely speculative, particularly in light of his testimony at the evidentiary hearing that only hours before the shooting, the defendant 'seemed just like the Michael Catlett I've always known.'" The Trial Court found that the testimony "would likely have been far more damaging than helpful, and the failure to call Woodward at the trial cannot be said to be professionally unreasonable."

■ The Trial Court's ruling is not clearly erroneous. While it is arguable that Mr. Woodward's testimony could have been used to rebut the State's evidence that he was preparing to flee the area, it is equally likely that such evidence could have undermined the insanity defense. Moreover, the evidence that Catlett may have been planning to flee the area was but one part of the State's proof that the murder was premeditated. The State also introduced evidence of Catlett's efforts to obtain a handgun as well as his statements to his friends, who testified that he said he was going to kill Miss Jungkind and that "someone who is manic

depressive could kill someone and get off on insanity." Accordingly, Catlett has not shown that there is a reasonable probability that the outcome of his trial would have been different.

Catlett next argues that defense counsel was ineffective for exercising a peremptory challenge against a juror who stated that he had experience with the mentally ill. Catlett claims that he was prejudiced because the presence of a juror who was sympathetic toward the mentally ill would have led to an acquittal or a hung jury.

During the postconviction hearing, defense counsel testified that he exercised a peremptory challenge against the juror because in addition to having experience with the mentally ill, the juror was also a pastor. Defense counsel then stated:

> I generally don't put pastors on juries in criminal cases because I'm not sure what kind of effect they might have on the other jurors or how other jurors might respond to them. In all due respect to their occupation, they quite often tend to be judgmental people, and I'm sure that played into our decision. . . Coupled with his experience in this area, I'm sure, led us to believe that we'd have a potentially dangerous expert in the box.

The Trial Court concluded that Catlett's claim presumes that the juror would have been sympathetic to his case, and that he has not shown that the jury that was selected was biased. Therefore, the Trial Court found that Catlett did not prove he was prejudiced by the exclusion of the juror. We agree. We note, furthermore, that the exclusion of this juror was a matter of trial strategy. *See generally Irons v. State*, 272 Ark. 493, 615 S.W.2d 374 (1981)(noting, in dicta, that the seating of a juror may be a matter of trial strategy).

Catlett next argues that his counsel was ineffective for failing to preserve for appeal an argument that assigned error to the Trial Court's decision to allow Rita Hawkins to testify. During the trial, when the State was seeking to introduce Ms. Hawkins's testimony, the prosecutor told the Trial Court that Ms. Hawkins "will testify that she drove with Michael Catlett to that travel agency on the date of the murder," and that Catlett, who went into the agency alone, came out with an unidentified packet of materials.

The prosecutor stated that Ms. Hawkins's testimony would help to prove the element of premeditation and deliberation. Although the prosecutor later said that Catlett and Ms. Hawkins went to the travel agency the day before the murder, rather than the actual date of the shooting, the Trial Court allowed the testimony on the following basis:

> Showing that he went into a travel agency on that day and came out with information about a trip, that of course, will be admissible.
>
> \*\*\*
>
> I don't see any unfair prejudice that would come from it. I don't know what other reasonable inferences can be drawn from it, other than when a person normally goes to a travel agency and comes out with material. It is close enough in time to this offense I think that would have relevance, counsel. So, that testimony, of course, will be allowed.

During the trial, however, Rita Hawkins did not testify that she accompanied Catlett to the travel agency on either the day of the shooting or the day before. Rather, she stated "I don't know exactly when it was; it was maybe two weeks relative to Michelle's shooting." Defense counsel did not lodge a relevancy objection after the time frame of Ms. Hawkins's testimony changed. Consequently, we declined to reach the issue in the direct appeal. *Catlett v. State, supra.*

██ ██ Catlett now contends that we would have reversed his conviction on this evidentiary question, and therefore, he was prejudiced by his attorney's failure to preserve the argument for appeal. Catlett also suggests that a proper objection would have prompted the Trial Court to exclude the testimony. There is no merit to these assertions. As indicated above, the State introduced other testimony that indicated that the murder was premeditated and deliberated. Consequently, it is unlikely that the exclusion of this testimony would have had changed the outcome of the trial. Furthermore, Ms. Hawkins's inability to recall the exact date of their visit to the travel agency does not render her testimony inadmissible. We have long held that the Trial Court has wide discretion when ruling about whether the probative value of testimony is outweighed by potential for prejudice. *Mixon v. State*, 330 Ark.

171, 954 S.W.2d 214 (1997). Ms. Hawkins's ability to recall the date of the trip to the travel agency, whether one day before the murder or two weeks, goes more to the weight of her testimony, rather than its admissibility. Therefore, we would not have reversed on this issue.

Catlett also argues that his trial counsel was ineffective for not preserving for appellate review an argument concerning the inadequacy of certain jury instructions. During the trial, the jury received instructions directly from The Arkansas Model Jury Instructions—Criminal. In the direct appeal, Catlett apparently attempted to argue that two of those instructions were improper. Specifically, he contended that the phrase "mental disease or defect," as it appears in AMCI 2d 609, should have been defined for the jury. Catlett also argued that AMCI 2d 105, which instructs the jury to disregard unreasonable expert opinion testimony, was "likely to be applied in a manner that prevents the consideration of constitutionally relevant evidence." Lastly, Catlett argued that these instructions, "which set out different standards for lay and expert testimony and allowing standardless rejection of expert testimony," were "erroneously given and created a real danger of arbitrary rejection of the evidence in support of Catlett's defense." We declined to reach these arguments because trial counsel "neither objected to the instructions given nor did he offer his own instructions." *Catlett v. State, supra.*

In this appeal, Catlett contends that he was prejudiced by his attorney's failure to lodge an objection or proffer alternate instructions. Specifically, he argues that if his attorney had properly objected to the instructions, it is likely the Trial Court would have sustained the objection or, in the alternative, we would have reversed his conviction. We note at the outset that each of the AMCI instructions of which Catlett complains is a proper statement of the law, and for that reason, neither an objection during the trial or the argument on appeal would have prevailed. Furthermore, Catlett has not offered a definition of "mental disease or defect," nor has he offered alternative instructions regarding opinion testimony. Accordingly, there is no merit to this argument.

Catlett next argues that his attorney was ineffective because he did not communicate an offer of a negotiated plea. He alleges that the State offered to allow him to plead guilty to a reduced charge of first degree murder, but that he did not learn of the offer until after his conviction. Catlett contends that if he had been aware of the offer, he would have accepted it.

 A plea agreement is an agreement between the accused and the prosecutor, not an agreement between counsel and the prosecutor. *Rassmussen v. State*, 280 Ark. 472, 658 S.W.2d 867 (1983). As such, counsel has the duty to advise his client of an offer of a negotiated plea. *Elmore v. State*, 285 Ark. 42, 684 S.W.2d 263 (1985).

 The Trial Court found that counsel was not ineffective because no firm offer was ever extended, and consequently, there "was no offer to communicate." Indeed, both defense counsel and the prosecutor testified that while a plea offer was discussed, no offer was ever made. The Trial Court was correct to deny relief on this issue.

Catlett next argues that his defense counsel was ineffective for not objecting to the introduction of the testimony and photographs describing the threatening graffiti that was found in certain areas of Little Rock. Catlett contends that defense counsel should have objected to the evidence on the basis that the State did not establish that he was indeed the author of the graffiti. He argues that he was prejudiced because the jury could attribute the graffiti to him without adequate foundation. Catlett suggests that "the outcome of the trial would have been different" had the jury not been able to consider that evidence.

 Counsel was not ineffective for failing to object to the introduction of the evidence because the graffiti was sufficiently linked to Catlett. It was undisputed that Catlett and Ms. Jungkind were well-acquainted. In each instance, the graffiti either specifically mentioned Ms. Jungkind or was drawn in a place where she was almost guaranteed to see it. Victoria Santos, Ms. Jungkind's co-worker, described the graffiti in the law firm's parking lot as being red and black in color, and as reading "Lucifer wants your soul, Stephanie Jungkind. . . ." Tracy Keith, a neighbor of Ms.

Jungkind and her sister, testified that the graffiti on their street read "Lucifer is coming for you. . .bitch, slut, whore." Steve Keith testified that the graffiti he saw in Murray Park contained Ms. Jungkind's name. Lastly, in his statement to Detective Leslie of the Little Rock Police, Catlett admitted that he painted satanic messages to scare Ms. Jungkind. Accordingly, there is no merit to this argument.

For his final argument in this appeal, Catlett contends that his counsel was ineffective because he had a conflict of interest. Specifically, he alleges that defense counsel went to high school with the victim's father, and that he has remained "good friends" with her father and uncle ever since. The Trial Court noted that defense counsel testified that he has not seen Ms. Jungkind's father since he left high school, which was approximately thirty years before the date of the hearing. The Trial Court also observed that defense counsel could not remember ever knowing Ms. Jungkind's uncle. Consequently, the Trial Court ruled that there was no conflict of interest.

Prejudice will be presumed from a conflict of counsel's interest only when the defendant demonstrates that counsel actively represented conflicting interests and that actual conflict of interest adversely affected his lawyer's performance. *Johnson v. State*, 321 Ark. 117, 900 S.W.2d 940 (1995). A petitioner has the burden of proving a conflict of interest and showing its adverse effects. *Id.* A petitioner is not entitled to relief unless he satisfies both prongs of the test. *Id.* The prejudice must be real and have a demonstrable detrimental effect and not merely have some abstract or theoretical effect. *Id.*

The Trial Court's finding of no conflict of interest is not clearly erroneous. We cannot imagine how the victim's relationship to one of defense counsel's high school classmates, whom he has not seen for thirty years, would create a conflict of interest that would compromise counsel's ability to effectively assist Catlett's defense. No such analysis needs to be applied in the case of the victim's uncle, whom defense counsel did not recall knowing at all.

Affirmed.