Keith Allen MYERS *v.* STATE of Arkansas

CR 97-139                                          972 S.W.2d 227

Supreme Court of Arkansas
Opinion delivered June 25, 1998

*John Wesley Hall, Jr.*, for appellant.

*Winston Bryant*, Att'y Gen., by: *O. Milton Fine II*, Asst. Att'y Gen., for appellee.

PER CURIAM. The appellant, Keith Allen Myers, was convicted of kidnapping and burglary and was sentenced to two concurrent terms of fifteen years' imprisonment. Myers's conviction and sentence resulted from his role in the kidnapping of Gina Hambuchen of Conway. Myers's wife and co-defendant, Amanda, was also charged for her role in the kidnapping. Amanda pleaded guilty to burglary and hindering apprehension. She was sentenced to two concurrent terms of five years' probation.

Both of the pleas were the result of a "package deal" offered by the prosecutor in exchange for each defendant's testimony against other members of the kidnapping conspiracy. One of the conditions of the offer, however, was that Myers and his wife both had to enter a guilty plea in order to consummate the deal. If either insisted on going to trial, it would automatically terminate the other's chance to enter a guilty plea. Throughout their plea negotiations, Myers and his wife were jointly represented by Mark Cambiano.

At the time of the kidnapping, Myers was on parole from a federal conviction for bank robbery. During his plea hearing, Mr. Cambiano explained to the trial court that a federal detainer had been filed against his client, and that it was likely that the kidnapping conviction would result in a revocation of Myers's federal parole. Mr. Cambiano then requested that the trial court recommend that his state time be served concurrently with the federal time that would result from the revocation. The trial court agreed to make the recommendation.

During the sentencing hearing, Mr. Cambiano once again broached the subject of a recommendation to the federal authorities that Myers serve his state and federal time concurrently in a federal institution. At that time, it was made clear that the recommendation was not purported to bind the federal court. As of the date of the postconviction hearing, Myers was serving his term in a state institution and no further action had been taken by the federal authorities.

Myers subsequently filed a timely petition for postconviction relief pursuant to Arkansas Criminal Procedure Rule 37. In his petition, Myers alleged that his attorney's joint representation of both him and his wife created a conflict of interest that interfered with Myers's right to effective assistance of counsel. Myers also alleged that his plea was not entered voluntarily and intelligently because Mr. Cambiano erroneously advised him that he would serve his State sentence concurrently with a federal sentence that he received pursuant to a prior conviction; and that the time

would be served in federal prison. After a hearing, the Circuit Court denied relief. Myers now appeals that order. We affirm.

Myers first assigns error to the Circuit Court's denial of his ineffective assistance of counsel claim based on his trial attorney's alleged conflict of interest. Myers alleges that Mr. Cambiano represented conflicting interests when he represented both Myers, who wanted to go to trial, and Amanda, who apparently wanted to accept the plea offer in order to avoid prison time. Myers also alleges that the conflict adversely affected his attorney's ability to represent him during the plea negotiations. Specifically, Myers contends that Mr. Cambiano, as well as his investigator, Wayne Lee, pressured him to accept the plea by telling him to "be a man" and "take the fall" for both him and his wife. Myers also asserts that Amanda and his attorney induced him to take the plea by assuring him that Amanda "would wait for him," during his incarceration when, in fact, she was planning to divorce him.

During the postconviction hearing, Myers testified that he was incarcerated at the county jail while he awaited his trial. Amanda was free on bond. Myers claimed that Amanda, Mr. Cambiano, and Mr. Lee visited the jail in order to inform him that the prosecutor and the Hambuchen family were willing to enter into plea negotiations. According to Myers, his attorney asked him if he would accept twenty years' imprisonment. Amanda would receive five years' probation. Myers testified that he responded, "I don't want Mandy to have any kind of time." When Mr. Cambiano asked him if he would accept fifteen years' imprisonment, Myers insisted upon going to trial.

Myers also testified that when he expressed his desire to go to trial, Mr. Lee made the comment that "if I was any kind of a man, if I loved my wife, I would take a plea bargain to assure her that she would not get any kind of jail time." Myers testified that when he asked Amanda what she wanted to do, she merely responded that she did not want to go to prison. Myers stated that he was told that his prior conviction in federal court for bank robbery "was making Mandy look real bad, and she was gonna

suffer for my previous conviction." Myers's testimony also suggested that while he maintained his desire to go to trial, his wife and his attorney became incommunicado in an effort to compel him to change his decision.

Myers stated that when the subject of taking a plea was reopened, he was assured by Amanda and Mr. Cambiano that she would wait for him during his incarceration, and that "whenever I got out, we were going to settle down and have children." Myers's testimony suggested that, while his attorney and Amanda were making these assurances, both knew that she intended to file for divorce. Myers alleged that his attorney also displayed his favoritism for Amanda when he allowed her to work in his law office while their case was pending.

Myers also testified that he was not the only person who questioned the wisdom of accepting the State's "package deal" plea offer. Mona "Janey" McNutt, an attorney retained by Myers shortly before the plea hearing, advised Myers that a conflict of interest existed in Mr. Cambiano's representation of both him and his wife. During direct examination, Myers testified concerning Ms. McNutt's representation as follows:

> Q. Do you remember talking to Mona McNutt prior to this?
>
> A. Yes, sir.
>
> Q. On November 27th, '95, she filed the—the initial petition for post-conviction relief in this case?
>
> A. Yes, sir.
>
> Q. And she was retained by your family?
>
> A. Yes, sir.
>
> Q. Relate to the Court what contact you had with her prior to the last order that we just discussed with the Judge.
>
> A. We had hired her to give us a second opinion.
>
> Q. On what?

A. On, uh, whenever the first plea—plea bargain was— was put out there. There were so many people, you know, "Don't take this plea bargain." It's ridiculous. It's ridiculous." So we hired on—we hired her to give us her opinion as to, you know, what should be done and what shouldn't be done. And she initially told Mark and Wayne—she wasn't on the case for very long. Because as soon as she'd gone and gotten a copy of the discovery from Mark— Mark's office—Mark and Wayne had talked to her. And she immediately told him that there was clearly a conflict of interest, because I didn't want to take a plea. Mandy wanted to take a plea. And so then we were told that Janey needed to be fired.

***

Q. Did she communicate to you that there was a potential conflict of interest for the lawyers?

A. Oh, yeah. Yeah.

Q. And what did that mean to you, if anything? You're not a lawyer yourself.

A. Yeah. Well, at that time, I mean, there was so much concern for Mandy's well-being that everything was just—was confusing. I mean, I didn't—I couldn't keep tabs on where she was. I didn't know what was going on with the case. So I,—you know, I didn't know.

On cross-examination, Myers testified as follows:

Q. Okay. Who hired Mona?

A. Mandy and I.

Q. Okay. And for what purpose was Mona hired?

A. For a second opinion.

Q. All right. And did she make any court appearances?

A. She came in one day to sit for a hearing, but I don't believe she said anything. She just sat in to hear.

Q. Okay. And who got her off of the case?

A. Mark asked me—no, Wayne asked me to ask her to step down because she was getting in the way.

\*\*\*

Q. Okay. Were you pressured—is it your testimony under oath that—that Wayne and Mark deprived you of your free will and forced you to fire Mona McNutt after you had hired her?

A. After we had given Mark as much money as we had, uh, he was running the show.

Q. How much money did you give Mona?

A. Not near as much as we had given Mark.

Q. Had you given her money?

A. Yes, sir.

Q. Okay. Could you have kept her on the case if you'd wanted to?

A. Yeah, we could have, but we were given an ultimatum, "Either get rid of her or I'm gone," type deal.

Q. So —

A. That was his exact words.

\*\*\*

Q. And you had to make a choice whether to get rid of Mona or keep Mark?

A. Uh-huh.

\*\*\*

Q. And you decided to get rid of Mona and keep Mark?

A. Uh-huh.

Q. Okay. Then Mark was the lawyer that stayed with you and did all this until after the plea, and then you filed the Rule 37, right?

A. Right.

Q. I understand. Now—and let's see, Mona filed the first Rule 37, and when this was set down for a hearing originally, she showed up representing you at it, right?

A. Right.

Q. Okay. Was there any collusion? Was this set up ahead of time when you hired Mona the first time, when Mark was working with you as well as you hired Mona to talk about this, and then you tell the Court you fired Mona, and then, after the plea went down and Amanda files for divorce and your codefendants get light sentences or are turned loose completely, you showed up in court with Mona asking that a Rule 37 be filed against your prior representation? Was— was that set up ahead of time, Keith?

A. No, it wasn't. When I—when I got sentenced and after Amanda told me that she wanted a divorce, I didn't care. I wasn't looking for no appeals. I wasn't looking for anything. I'm not ashamed to admit that whenever—the second week I was down at Diagnostics, I'd attempted suicide, didn't care, didn't want to live, didn't want to live with it anymore. And my family and Janey, they had gotten together and said, "If Keith isn't gonna do this for himself, we're gonna do it for him." I've gotten more involved as it's progressed, but before I—I didn't care anything about it.

Mona McNutt testified that a few days before the plea hearing, Myers asked her for an opinion about the plea bargain. Ms. McNutt characterized her contact with Myers as "more or less an eleventh hour effort on Keith's part to get a second opinion in regard to whether or not he should take the plea bargain that had been offered jointly to him and Amanda." Ms. McNutt stated that Myers was "torn between the fifteen years that he didn't particularly want to spend versus the assurance that his wife would have no years."

Ms. McNutt stated that after she met separately with Myers and Amanda, she opined that it was a conflict of interest for one lawyer to represent both of them. Ms. McNutt also testified that she was not satisfied with the fifteen years' imprisonment that Myers would have to serve if he accepted the offer. On cross-examination, she stated that, according to what she was told about Myers's role in the crime, she could not foresee a jury sentencing

him to fifteen years. Ms. McNutt did concede, however, that she would have encouraged a guilty plea if the offer had been for a shorter prison term. Ms. McNutt also testified that while she did not represent Mr. Myers during the plea hearing, she did subsequently prepare the Rule 37 petition.

Mark Cambiano testified that "no one in my presence or on my behalf said (to Myers) that he couldn't put Mandy in the position of going to the pen and that he had to 'be a man.'" Mr. Cambiano stated that any claim that he avoided Myers while he insisted on going to trial was untrue. Mr. Cambiano also testified that Myers was uncertain about whether he should take the plea, and that he was indeed concerned about Amanda's fate should he decide to go to trial. He stated that he urged Myers to remove Amanda from his decision, and to only accept the plea if he thought it was in his best interest.

Mr. Cambiano advised Myers that it was in his best interest to take the plea, especially in light of his federal conviction. According to Mr. Cambiano, there was a possibility that whatever sentence he received after a trial could run consecutive to a federal sentence that he received after his federal parole was revoked. The guilty plea, on the other hand, would increase the chance that the trial court would recommend that the state sentence and the federal sentence run concurrently.

Mr. Cambiano also testified that he had no objection once he learned that Myers retained Ms. McNutt to obtain her opinion about the plea offer. Mr. Cambiano stated that he felt good enough about his representation of Myers that he did not mind the scrutiny of another attorney. He stated that while Ms. McNutt initially had reservations about the wisdom of accepting the offer, she eventually agreed that it was in Myers's best interest to do so.

In the order denying relief, the Circuit Court ruled as follows on the first claim in Myers's petition:

. . . This Honorable Court has had an opportunity on numerous occasions throughout all the hearings and appearances had in the above styled case numbers, and in other cases to observe the demeanor of petitioner herein, Keith Myers, and has had an opportunity to hear sworn testimony given by him in support of his Rule 37 petition as well as in other hearings in the above styled case numbers and has had an opportunity to make a determination as to his credibility.

That based upon testimony given by witnesses and argument of counsel herein the Court doth find that Mr. Myers was competently represented by the Hon. Mona Jane McNutt prior to his entering a guilty plea in the above styled causes as well as Mr. Mark Cambiano, and that petitioner did dismiss Ms. McNutt after obtaining advice relative to the entry of said plea and did continue to be represented by Mark Cambiano.

That petitioner's argument that he entered his plea based upon his belief that his co-defendant wife would wait for him to be released from prison and that they would maintain their family relationship is without merit and in conflict with this Court's observation of the parties and the Court does find said claim to be without merit and not credible as well as if true failing to provide a legal basis for the relief sought.

The Court added toward at the conclusion of the order:

All of the petitioner's actions, statements and sworn testimony prior to the filing of this Rule 37 Petition are consistent with the fact that he was ably and competently represented and that he entered his guilty plea with full knowledge of the ramifications thereof and with no justified reliance upon any promises or representations made other than the written recommendations of the State and that petitioner's testimony to the contrary subsequent to the filing of said Rule 37 Petition is not credible based upon the Court's knowledge of the testimony and facts as adduced in this matter ab initio and its opportunity to observe the witnesses and their demeanor.

█ █  It is settled that "[r]equiring or permitting a single attorney to represent co-defendants, often referred to as joint representation, is not *per se* violative of constitutional guarantees of ineffective assistance of counsel. *Holloway v. Arkansas*, 435 U.S.

475 (1978). Appointing or permitting a single attorney to represent co-defendants, however, does create a possible conflict of interest that could prejudice either or both clients. *See Burger v. Kemp*, 483 U.S. 776 (1987). The possibility of prejudice does not justify an "inflexible rule that would presume prejudice in all cases." *Id.* Instead, prejudice is only presumed if the defendant demonstrates that counsel "actively represented conflicting interests," and "an actual conflict of interest adversely affected his lawyer's performance." *Sheridan v. State*, 331 Ark. 1, 959 S.W.2d 29 (1998). In order to successfully assert a claim of ineffective counsel based on a conflict of interest, a defendant who entered a guilty plea must establish that there was an actual conflict of interest, and that the conflict adversely affected the voluntary nature of the guilty plea entered by the defendant. *Thomas v. Foltz*, 818 F.2d 476 (6th. Cir. 1987).

In its order, the Circuit Court did not make a finding as to whether an actual conflict of interest existed in Mr. Cambiano's representation of both Myers and his wife. Rather, the Circuit Court appeared to find that Myers waived any possible conflict when, after consulting Ms. McNutt for her opinion on the plea offer, he decided to keep Mr. Cambiano as his attorney during the plea process. The Circuit Court also found that Myers's testimony was not credible. We conclude that the Circuit Court's denial of postconviction relief is not clearly erroneous. *Catlett v. State*, 331 Ark. 270, 962 S.W.2d 313 (1998).

In *Murray v. State*, 280 Ark. 531, 659 S.W.2d 944 (1983), Murray and his wife were charged, tried, and convicted as co-defendants for sale of marijuana and possession of marijuana with intent to deliver. Murray later sought postconviction relief based on a claim of ineffective assistance of counsel. As in the instant case, Murray alleged that his counsel was ineffective because his joint representation of both Murray and his wife created a conflict of interest. Murray argued that the conflict caused his counsel to avoid pursuing an alternative defense strategy that would have called for Murray taking the stand and testifying that his wife was responsible for all of the wrongdoing.

We declined to reverse the lower court's denial of Murray's ineffective assistance of counsel claim. Our primary reason for doing so was our observation that, in light of the other evidence that indicated Murray's substantial involvement in the crimes, a defense that placed all of the blame on his wife was not plausible. We concluded, therefore, that since the alternative strategy was not plausible, "the conflict was not actual or significant."

■ We also noted, however, that even if Murray's case presented an actual conflict, there was another reason to deny relief. We observed that Murray's attorney and his wife had occasion to represent them jointly in other criminal and civil matters, and more important, that "during the trial there was neither objection, nor claim, nor notice to the court of any potential conflict. The alleged conflict was not mentioned until the post-conviction proceeding . . . ." We then stated the other legal basis for which we could have affirmed the denial of relief:

> The Sixth Amendment right to counsel may be knowingly, intentionally, and voluntarily waived. Here appellant knew of the alleged conflict, intentionally did not disclose it and voluntarily proceeded with his retained counsel. "Appellant cannot now, after knowingly completing the trial with such counsel, urge that he was prejudiced." *United States v. James*, 505 F.2d 898 (5th Cir. 1975), quoting from *Nelson v. United States*, 415 F.2d 483 (5th Cir. 1969), cert. den. 396 U.S. 1069 (1970).

Similarly, in this case, Myers testified that he retained Mona McNutt for a "second opinion" concerning the plea offer shortly before the plea hearing. According to Myers, Ms. McNutt made him aware of the conflict of interest that allegedly existed as a result of Mr. Cambiano's joint representation of Myers, who desired to go to trial, and Amanda, who did not. Ms. McNutt also testified that she was retained by Myers shortly before the plea hearing, and that she recognized a potential conflict of interest in connection with Mr. Cambiano's representation. Ms. McNutt stated that she informed Mr. Cambiano of this conflict.

■ Despite Ms. McNutt's advice about the potential conflict of interest, Myers chose to keep Mr. Cambiano as his attorney during the plea process and sentencing hearing. During the plea

hearing, moreover, Myers declared that he was satisfied with the legal services rendered in his behalf, and that he did not have any complaints about the way he was represented. The alleged conflict of interest was not brought to the attention of the court until the Rule 37 petition was filed. In light of all of these circumstances, we conclude that Myers waived the alleged conflict of interest.

Myers next argues that his guilty plea was not voluntary because he entered the plea upon Mr. Cambiano's representation that he would serve his term of imprisonment concurrently with the sentence he would receive when his federal parole was revoked. Myers asserts that Cambiano's advice on this issue, as well as his belief that he would serve both sentences in federal prison, was the basis of his decision to plead guilty. In other words, Myers contends that, but for Mr. Cambiano's advice that he would serve his time in that manner, he would not have pleaded guilty and would have insisted on going to trial.

While we are mindful of the fact that such an assertion is necessary in order to make the showing required by *Hill v. Lockhart*, 474 U.S. 52 (1985), there is an apparent inconsistency between that assertion and the first claim in Myers's petition. In that claim, Myers alleged that his guilty plea was compelled by his concern over his wife's fate and the pressure exerted by his attorney and his staff. We now understand Myers's position to be that he would not have yielded to his attorney's pressure or sacrificed himself in order to avoid his wife's incarceration if Mr. Cambiano had not also erroneously advised him that he would serve both of his sentences in federal prison.

In any event, we conclude that the Circuit Court's denial of relief on this claim was not clearly erroneous. In its order, the Circuit Court concluded that it was made clear that its recommendation concerning the manner in which Myers would serve his sentence would not bind the federal court. Indeed, Myers's abstract of the sentencing hearing reveals that the following discussion took place in open court:

> MR. CAMBIANO: Upon the basis of his plea was that he be sentenced concurrently with the charge with each other and

concurrently with the federal charges, with recommendation that he serve his federal time first.

THE COURT: I believe that was part of it, and I have no problem with that.

PROSECUTOR: The only thing is with regard to the order purporting to bind the federal court.

MR. CAMBIANO: It will not bind them. It's a recommendation.

THE COURT: All right, It's a recommendation. It's not binding.

Other evidence introduced during the postconviction hearing revealed that after Myers was sent to a state, rather than federal facility, Mr. Cambiano became aware that the trial court's recommendation was omitted from the judgment and commitment order. At Mr. Cambiano's request, the judgment and commitment order was amended to reflect the recommendation.

Mr. Cambiano also testified as follows:

He (Myers) also wanted to make sure that he did his time in the federal penitentiary. And I told him we'd do our best to get it to where he did do his time in the federal penitentiary, and that we would make our best efforts to do so. There was no guarantee that he would do it in the federal penitentiary. He knew that. And that's pretty much what we told him.

\*\*\*

I absolutely made it clear to (Myers) that I could not bind the federal system or control or direct what they would do.

The Circuit Court apparently credited Mr. Cambiano's testimony about the extent of Myers's understanding of the likelihood that he would serve his federal sentence first. The resolution of credibility issues is within the province of the trial court. *Johnson v. State*, 321 Ark. 117, 900 S.W.2d 940 (1995). Accordingly, we affirm the Circuit Court's denial of relief on this claim.

Affirmed.