Robert Neal HELTON Jr. *v.* STATE of Arkansas

CR 96-106 924 S.W.2d 239

Supreme Court of Arkansas
Opinion delivered June 24, 1996

*Etoch Law Firm*, by: *Louis A. Etoch*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Clint Miller*, Deputy Att'y Gen. and Senior Appellate Advocate, for appellee.

DONALD L. CORBIN, Justice. Appellant, Robert Neal Helton Jr. was found guilty by a jury of rape in 1994 and sentenced to life in the Arkansas Department of Correction. This court affirmed. *Helton* v. *State*, 320 Ark. 352, 896 S.W.2d 887 (1995). Helton now appeals the ruling of the Saline County Circuit Court denying him postconviction relief under Rule 37.1 of the Arkansas Rules of Criminal Procedure. Jurisdiction is properly in this court pursuant to Ark. Sup. Ct. R. 1-2(a)(5). In support of his claims on appeal, appellant argues that he was denied effective assistance of trial counsel during the guilt phase as well as the sentencing phase of the trial. We find no error in the denial of postconviction relief, and therefore we affirm.

We see no need to repeat the facts of this case as they are fully stated in our prior decision. *Helton*, 320 Ark. 352, 896 S.W.2d 887 (1995). Suffice it to say that appellant was convicted of rape and sentenced by the jury to life imprisonment. During appellant's trial, the state called five witnesses, including the victim, the couple with whom the victim resided, the victim's boyfriend, and the police detective assigned to the case. The state introduced no physical or documentary evidence, nor any medical evidence during the guilt phase of the trial. Appellant did not take the stand in his own behalf; however, three alibi witnesses, appellant's fiancée and her parents, testified in his defense. Appellant presented no physical or medical evidence during either phase of the trial. Following appellant's conviction, direct appeal was taken, and this court affirmed the judgment of conviction.

Appellant argues on appeal that his trial counsel was ineffective during both the guilt phase and the sentencing phase of the trial. Specifically, appellant asserts that trial counsel was ineffective during the guilt phase in failing to call three additional witnesses for the

defense and in failing to secure independent DNA testing. Appellant claims that trial counsel was ineffective during the sentencing phase for not calling any witnesses nor presenting any argument in mitigation. We conclude there is no merit to either of appellant's claims.

## I. Standard of Review

This court will reverse a trial court's denial of postconviction relief only if its findings are clearly erroneous or clearly against the preponderance of the evidence. *Vickers v. State*, 320 Ark. 437, 898 S.W.2d 26 (1995). In order to succeed on a claim of ineffective assistance of counsel, a petitioner must show that counsel's conduct was outside the range of reasonably professional assistance and sufficiently deficient to have denied petitioner a fair trial. *Neff v. State*, 287 Ark. 88, 696 S.W.2d 736 (1985). There is a strong presumption that trial counsel's conduct falls within the wide range of reasonable professional assistance, and a petitioner has the burden of overcoming this presumption by identifying specific acts or omissions of trial counsel which, when viewed from counsel's perspective at the time of the trial, could not have been the result of reasonable professional judgment. *See, e.g., Wainwright v. State*, 307 Ark. 569, 823 S.W.2d 449 (1992); *Dumond v. State*, 294 Ark. 379, 743 S.W.2d 779 (1988). Furthermore, matters of trial tactics and strategy are not grounds for postconviction relief. *Vickers*, 320 Ark. 437, 898 S.W.2d 26; *Leasure v. State*, 254 Ark. 961, 497 S.W.2d 1 (1973).

This court has expressly adopted the criteria for establishing a claim of ineffective assistance of counsel set forth by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). *See Crockett v. State*, 282 Ark. 582, 669 S.W.2d 896 (1984). In *Strickland*, the Supreme Court held:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction . . . has two components. First the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to

deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland*, 466 U.S. at 687.

 Because there is a strong presumption that a duly licensed attorney is competent, a court deciding an ineffectiveness claim must consider the totality of the evidence that was before the jury and judge the reasonableness of the challenged conduct on the facts of the particular case at the time of counsel's actions. *Dumond*, 294 Ark. 379, 743 S.W.2d 779. But, under the *Strickland* standard, even professionally unreasonable errors by counsel do not warrant reversal of a conviction if the errors were not prejudicial to the defendant and had no effect on the judgment. *Noble v. State*, 319 Ark. 407, 892 S.W.2d 477 (1995). In other words, a petitioner must show that but for counsel's errors at trial, the outcome of the case would have been different. *Rowe v. State*, 318 Ark. 25, 883 S.W.2d 804 (1994); *Pruett v. State*, 287 Ark. 124, 697 S.W.2d 872 (1985). In reviewing appellant's claims, we must first determine whether any of counsel's alleged errors fall outside the range of professionally reasonable assistance, and if so, whether there is a reasonable probability that the outcome of appellant's case would have been different. We address each of the allegations separately.

## II. Omission of Additional Witnesses

Appellant first argues that he was denied effective assistance of counsel because his attorney failed to call three additional witnesses on his behalf: (1) Edward Vollman, Chief Serologist at the Arkansas State Crime Laboratory; (2) Michael Melson, an additional alibi witness; and (3) Tommy Bittle, a friend of appellant. With respect to Mr. Vollman, appellant argues that trial counsel should have called him to testify about the medical evidence submitted by the state upon which he conducted tests. Appellant asserts that this testimony could have changed the outcome of the trial as it would have cleared him of the charge of rape.

Pursuant to court order, blood and hair samples from appellant were submitted to the state crime laboratory for comparison with the semen found on vaginal swabs included in a rape kit performed on the victim and semen found in the victim's underpants. During the hearing conducted on the Rule 37 petition, Mr. Vollman testified that both appellant and the victim had the same blood type ("O"); that both were secretors (persons who secret their ABO

blood grouping into all their body fluids); and that both possessed the PGM Type-1 enzyme. Mr. Vollman stated that the results of the testing of the vaginal swabs revealed the presence of the "H" blood group substance and the PGM Type-1 enzyme. According to Mr. Vollman, the "H" substance could have been deposited by any person who is a secretor (about eighty percent of the population), no matter what the person's ABO blood type. Mr. Vollman further stated that the "H" substance and the PGM Type-1 enzyme found on the vaginal swabs could have come from either the victim or appellant.

As for the semen discovered in the victim's underpants, Mr. Vollman stated that he found the presence of the "H" substance, as well as the presence of the "B" blood group substance. Again, Mr. Vollman stated that the "H" substance could have been deposited in the underpants by either appellant or the victim. In contrast, however, Mr. Vollman stated that because the "B" substance could only have been deposited by a person having blood type "B," someone other than appellant or the victim must have deposited the "B" substance found in the underpants. Appellant thus asserts that Mr. Vollman's testimony demonstrates that none of the serology tests could connect him to the victim in any way, and that trial counsel was ineffective for failing to put this witness on the stand.

Appellant's argument is flawed because he assumes that the serologist's testimony would have completely eliminated him as the perpetrator. Mr. Vollman testified that the semen found on the vaginal swabs taken from the victim could have been deposited by either the victim or appellant, and that the tests he performed did not exclude appellant as the perpetrator. As for the semen found in the victim's underpants, Mr. Vollman stated that the "H" substance could have been deposited by appellant, but that the "B" substance could not have come from him. The fact that a blood group substance different from appellant's was detected in the semen found in the victim's underpants did not rule out that appellant committed the crime, as the victim testified that she had had sexual intercourse with her boyfriend during the same time frame. The jury could have found that the medical evidence was thus consistent with appellant's guilt. It is certainly possible that the victim's boyfriend was responsible for the presence of the "B" substance found in the victim's underpants. It would appear then, that had Mr. Vollman

been called as a defense witness, his testimony would not have been entirely favorable to appellant's case.

During the Rule 37 hearing, appellant's trial counsel, Joe Kelly Hardin, explained his reasons for not calling Mr. Vollman as a witness. Mr. Hardin stated that he felt that the medical testing done by the state crime laboratory was inconclusive and that it could have hurt the defense as much as it could have helped. Mr. Hardin stated that he had heard the prosecution argue those types of results, whether positive or negative, "a thousand times." Mr. Hardin stated he felt the tests were inconclusive and that the victim's testimony that she had sex with her boyfriend on the night of the rape may have explained those findings. Mr. Hardin stated that he felt that appellant's best chance of being acquitted was to present an alibi defense and then argue that the state had not met its burden of proof since it was only the victim's word against appellant's.

The state did not attempt to bolster its case by presenting Mr. Vollman's testimony or any other medical evidence. In this way, Mr. Hardin's defense strategy seems logical, as he could and did argue to the jury that the victim's testimony was not corroborated by any medical evidence linking appellant to the crime. In light of the fact that the medical evidence could have harmed the defense just as easily as it could have helped, we cannot say that the decision not to call Mr. Vollman as a witness for the defense amounted to ineffective assistance of counsel.

■■ Trial counsel's decision not to present Mr. Vollman's testimony was a tactical one within the realm of counsel's professional judgment. This court has previously held that an attorney's decision not to call a particular witness is largely a matter of professional judgment, and the fact that there was a witness or witnesses who could have offered testimony beneficial to the defense is not itself proof of counsel's ineffectiveness. *Dumond*, 294 Ark. 379, 743 S.W.2d 779 (1988); *Tackett* v. *State*, 284 Ark. 211, 680 S.W.2d 696 (1984). Moreover, Rule 37 does not provide a forum to debate trial tactics or strategy, even if that strategy proves improvident. *Watson* v. *State*, 282 Ark. 246, 667 S.W.2d 953 (1984).

The second witness appellant argues should have been called to testify was Michael Melson. Michael Melson is the brother of petitioner's fiancée, Deborah Melson. Appellant argues that Mr. Melson would have been the best witness for his alibi defense,

and that trial counsel was ineffective for not calling him to testify. During the Rule 37 hearing, Mr. Melson testified that on the night of the rape, appellant spent the night at Melson's house; that they worked on appellant's truck until about 11:00 p.m.; that they went inside the house around 11:00 p.m. and each took a shower and went to sleep; that he was awake until 1:00 or 1:30 a.m.; and that when he got up the next morning, appellant was still on the couch. Appellant asserts that Mr. Melson's testimony would have been better received by the jury than the testimony of Deborah Melson, because of her relationship to appellant, and the testimony of her parents, because their testimony was confusing to the jury.

Had Mr. Melson testified at trial as he did at the Rule 37 hearing, his testimony would have been inconsistent with that of his sister, Deborah Melson, as Deborah Melson testified that appellant had been asleep with her in her bedroom that night, not asleep on the couch as Michael Melson would have claimed. When questioned about the decision not to put Michael Melson on the witness stand, Mr. Hardin stated that his decision was based on the fact that the other three members of the Melson family had testified so badly that he felt it was best not to submit an additional bad witness, especially one who would testify to essentially the same things the other three had described. We cannot say that the decision not to call Mr. Melson was anything other than trial strategy, and thus counsel's decision is not grounds for granting postconviction relief.

During the hearing below, both Mr. Hardin and Mr. Melson indicated that Melson would testify essentially the same as appellant's other three witnesses. We are, therefore, satisfied that Mr. Melson's testimony would have been cumulative, and as such, counsel's decision not to call this witness was neither erroneous nor prejudicial to the defense. The omission of a witness when his or her testimony is cumulative does not deprive the defense of vital evidence. *Dumond*, 294 Ark. 379, 743 S.W.2d 779.

Appellant's reliance on *Farmer v. State*, 321 Ark. 283, 902 S.W.2d 209 (1995) is misplaced. In *Farmer*, this court held that trial counsel was ineffective because he failed to subpoena the only witness who could corroborate the defendant's version of the events, and because counsel did not request a continuance when the witness did not appear at trial. Because Mr. Melson was not the only witness who could corroborate appellant's alibi, this case is distinguishable from *Farmer*. In the present case, three alibi witnesses

were presented to the jury.

The third witness appellant asserts should have been called in his defense is Tommy Bittle. Tommy Bittle testified at the hearing below to a prior inconsistent statement made to him by the victim. Specifically, Mr. Bittle stated that he had spoken to the victim and that she had told him that appellant had made advances toward her and that when she declined the last advance, appellant grabbed her by the throat until she screamed, and that appellant then let her go. Mr. Bittle stated that during their conversation, he had stated to the victim, "So, nothing really happened," and that the victim had responded by saying that, "What he did was he scared me real bad." Mr. Bittle stated that the victim had told him that she had been raped before. Appellant argues that this testimony by Mr. Bittle would have demonstrated that the victim was lying about the act of rape. Mr. Bittle stated that he had told appellant about this conversation with the victim, and that he had also told appellant's mother and another individual. On cross-examination, however, Mr. Bittle admitted that he had not reported this conversation to the police.

Mr. Hardin testified that the first time he had ever heard about Tommy Bittle's conversation with the victim was at the Rule 37 hearing. Mr. Hardin stated that to the best of his recollection, appellant had never told him about Tommy Bittle's conversation with the victim, and that if appellant had told him about this evidence, he would have remembered it. In contrast, during his testimony at the Rule 37 hearing, appellant claimed that he had told Mr. Hardin about Tommy Bittle's conversation with the victim prior to the trial.

Appellant asserts that had counsel properly investigated the case, he would have discovered the existence of Mr. Bittle's prior conversation with the victim. As it appears to be appellant's word against Mr. Hardin's concerning counsel's knowledge of the witness, we are unable to determine whether counsel's omission fell outside the range of professionally reasonable assistance. However, even if we assume that it was error for counsel not to have discovered Mr. Bittle's testimony, we cannot say that such an error prejudiced appellant's defense. Appellant's counsel had strategically developed an alibi defense and had presented witnesses in support of that strategy. Mr. Bittle's testimony would have been in direct conflict with this strategy. On the one hand, appellant would have been claiming through his alibi witnesses that he was never with the

victim that night, while on the other hand, through Mr. Bittle's testimony, it would have appeared that appellant was admitting that he was with the victim that night, that he made advances toward her, that he became violent when she rejected his advances, but that she was lying about the occurrence of sexual intercourse. We cannot say that counsel's omission was prejudicial to appellant's case, even though it may have tended to somewhat discredit the victim's testimony. Further, we are not prepared to go so far as to say that counsel omitted this testimony at all, since counsel testified that he had never been informed of the information before trial. Because this conflicting testimony was potentially damaging to the defense, we hold that the failure of counsel to call Tommy Bittle as a defense witness, even if counsel had been aware of his testimony, did not amount to ineffective assistance of counsel.

 In his brief, appellant relies on this court's decision in *Wicoff* v. *State*, 321 Ark. 97, 900 S.W.2d 187 (1995), for the proposition that counsel's omission of these additional witnesses is grounds for granting him relief. In *Wicoff*, this court granted postconviction relief on the bases that counsel failed to present additional witnesses to the jury, witnesses which counsel admitted would have provided vital information to the jury and would have tended to raise doubt in the minds of the jurors. This court held that the omitted testimony was prejudicial to Wicoff's defense, and necessarily deprived him of a fair trial. In contrast, trial counsel in the present case has denied the vitality of the omitted testimony from Mr. Vollman and Mr. Melson, has denied knowledge of the testimony of Mr. Bittle, and has given full explanations as to his reasons for not presenting their testimony to the jury. Given counsel's reasonable explanations, we are satisfied that the omitted testimony was not in fact prejudicial to appellant's case. Appellant also relies on *Russell* v. *State*, 302 Ark. 274, 789 S.W.2d 720 (1990). In *Russell*, this court held that because counsel failed to call the two witnesses who could cast doubt on the defendant's guilt, witnesses of whom counsel admitted he was aware, counsel's trial performance fell below an objective standard of competence, and that the defendant was prejudiced as a result. Again, for the reasons outlined above, *Russell* is distinguishable from the present case.

### III. Omission of Independent DNA Testing

As part of his first point on appeal, appellant argues that trial counsel was ineffective in failing to secure DNA testing on the

semen samples collected from the victim and appellant. Appellant argues that had counsel sought DNA analysis he would have been completely cleared as the perpetrator.

Appellant submits that at the time of his trial, DNA analysis was widely accepted as a means of scientific testing. The state does not dispute this. At the Rule 37 hearing, Mr. Vollman testified that DNA testing was both widely accepted and available to defendants. Mr. Vollman indicated that if appellant had not had sexual intercourse with the victim, the results of a DNA test would likely have excluded him as the perpetrator. On the other hand, Mr. Vollman stated, if appellant had engaged in sexual intercourse with the victim, a DNA test could likely identify him as the perpetrator.

In defense of his decision not to seek independent DNA testing, Mr. Hardin stated that, although he was aware of the availability and acceptance of DNA testing, he did not seek a DNA test because he was concerned that once he had requested the test, he would have been obligated to provide the results to the state, and if the results had "nailed" appellant as the perpetrator, there would have been no possibility of getting him acquitted. As it was, the evidence against appellant consisted of the testimony of the victim and those persons she told about the rape. Mr. Hardin stated that he felt appellant had a better chance at acquittal with the alibi witnesses he had prepared, especially if they would have been better witnesses, and with his argument attacking the state's case for lack of evidence.

We are convinced that the decision not to seek independent DNA testing was a decision clearly within the realm of counsel's professional judgment and trial strategy. In *Dumond*, this court observed:

> There are numerous scientific tests which could be conducted on physical evidence in a criminal trial and failure of counsel to seek a particular test will not amount to a denial of the counsel guaranteed by the sixth amendment unless it can be concluded that the test was one *which any competent attorney under the same circumstances* would have sought.

294 Ark. 379, 386, 743 S.W.2d 779, 782-83 (emphasis added).

We cannot say that any competent attorney defending a client on a charge of rape would necessarily have sought independent

DNA testing in an attempt to bolster the client's defense. This is especially true in a situation where the evidence against a defendant consists solely of the victim's testimony. The decision whether or not to seek such a test is a big gamble in that the evidence is likely to be conclusive one way or the other — either eliminating the defendant as the perpetrator or implicating him as such. Mr. Hardin's explanation of his decision not to seek DNA testing is reasonable, especially in light of the fact that had the test been completed and the results were unfavorable to appellant, the state would have been able to use that evidence against appellant in its case-in-chief.

Appellant offers no proof that any competent attorney in Mr. Hardin's situation would have sought such a test, let alone any proof that but for counsel's failure to request a DNA test, there is a reasonable probability that the outcome of his trial would have been different. This court is unwilling to view counsel's conduct in hindsight, and we are not convinced that the results of any scientific testing would have altered the outcome of appellant's trial. This is especially true in light of this court's previous determination that a victim's testimony alone provides substantial evidence to support a conviction of rape. *See Bishop v. State*, 310 Ark. 479, 839 S.W.2d 6 (1992). Furthermore, since we do not know what the outcome of the tests would have been, we cannot gauge whether DNA testing would have caused the jury to have a reasonable doubt of appellant's guilt. Thus, we cannot hold that the trial court was clearly erroneous in finding that trial counsel was not ineffective in failing to seek independent DNA testing.

### IV. Mitigation in Sentencing

For his final point appellant argues that counsel was ineffective during the sentencing phase of the trial because he did not present any mitigating evidence or argument in an attempt to persuade the jury to be lenient in sentencing appellant. Appellant has failed to identify with any specificity what mitigating evidence counsel omitted during sentencing, and instead provides us with only bare allegations. This is his burden under the standard provided in *Strickland*. Since appellant cannot even prove that any mitigating evidence existed, we hold that trial counsel's conduct did not deprive petitioner of effective assistance of counsel. *See Swindler v. State*, 272 Ark. 340, 617 S.W.2d 1 (1981). It is for this reason, as well as those stated above, that we affirm the trial court's ruling denying appellant postconviction relief.

Affirmed.

NEWBERN and BROWN, JJ., dissent.

DUDLEY, J., not participating.

ROBERT L. BROWN, Justice, dissenting. I would grant a new trial solely on the basis that trial counsel failed to call the crime lab serologist, Edward Vollman. Vollman testified at the Rule 37 hearing that his tests confirmed that the victim and Helton had the same blood type which was "O." Seminal stains found on the victim's underpants, however, confirmed a "B" blood type, which was not Helton's blood group. That was a crucial piece of medical evidence. In my judgment, that evidence could have changed the outcome of the trial by creating a reasonable doubt of culpability. It certainly denied Helton a fair trial.

It is true that Helton is a "secretor," and evidence of a secretor's semen was found. But 80 percent of the population are secretors and the inescapable fact is Helton's blood type was not found. A third party was involved. This is how the serologist put it:

DEFENSE COUNSEL: And Robert Helton, could he have left that fluid or item in her underpants with the B group?

VOLLMAN: No.

DEFENSE COUNSEL: Could not have have (sic) occurred?

VOLLMAN: No.

DEFENSE COUNSEL: So really then Robert Helton is excluded from depositing the bodily fluid or substance that was found in Rebecca Shyrock's undepants (sic) the very next day in the rape kit that you tested?

VOLLMAN: He is excluded from the "B" substance. There's also the "H" substance that was present, which he is not excluded from.

DEFENSE COUNSEL: Let me ask about the "B" and the "H" substance. Could the same person that deposited the "B" substance, that person being someone other than Robert Helton, could that person also have deposited the "H" substance?

VOLLMAN: Yes, because a person can deposit the "H" substance no matter what their ABO type is if they are a secretor.

DEFENSE COUNSEL: So the "B" and the "H" could have been deposited by the same person and that person would not have been Robert Helton, correct?

VOLLMAN: That's a possibility.

DEFENSE COUNSEL: The "H" substance could have been deposited by Rebecca Shyrock because she was a type "O", is that correct?

VOLLMAN: Yes.

DEFENSE COUNSEL: But there's no way that "B" substance could have been deposited either by Robert Helton or Rebecca Shyrock?

VOLLMAN: That's correct.

DEFENSE COUNSEL: It came from some third person?

VOLLMAN: Yes.

Trial counsel urged at the Rule 37 hearing that he did not call the serologist as a witness because he wanted to argue that the State produced no corroborative medical evidence. That argument might have some appeal but for the fact that the serologist had exculpatory evidence that would have aided the defense. The State, of course, did not call Vollman for obvious reasons.

In *Wicoff* v. *State*, 321 Ark. 97, 900 S.W.2d 187 (1995), we granted a new trial due to counsel's failure to call the defendant's grandmother who would have testified that the eleven-year-old victim told her she fabricated the rape story. The exculpatory evidence in this case, as it relates to blood type, is even more persuasive and less subject to challenge than a grandmother's testimony.

In 1992, the Missouri Supreme Court reversed a rape conviction due to trial counsel's failure to obtain requested blood tests and granted a new trial. *Moore* v. *Missouri*, 827 S.W.2d 213 (Mo. 1992) (en banc). Those tests would have shown that the source of the semen found on bed sheets could not have been the defendant. The

Supreme Court held that counsel's failure to obtain the results fell below reasonable and customary standards and that there was at least a reasonable probability that the trial results would have been different. The *Helton* case is certainly analogous to these facts.

The jury should have been privy to this important piece of medical evidence in reaching its verdict. I respectfully dissent.

NEWBERN, J., joins.