Ledell LEE *v.* STATE of Arkansas

CR 99-1116 38 S.W.3d 334

Supreme Court of Arkansas
Opinion delivered February 22, 2001

704

*Craig Lambert,* for appellant.

*Mark Pryor,* Att'y Gen., by: *James R. Gowen, Jr.,* Ass't Att'y Gen., for appellee.

TOM GLAZE, Justice. Ledell Lee was convicted and sentenced to death for the 1993 capital murder of Jackson-

ville resident Debra Reese; that conviction was affirmed by this court in *Lee v. State*, 327 Ark. 692, 942 S.W.2d 231 (1997). Lee subsequently filed a petition for postconviction relief pursuant to Ark. R. Crim. P. 37, alleging that his trial attorneys, Bill Simpson, Bret Qualls, and Dale Adams, had rendered ineffective assistance of counsel. The trial court denied the petition, and on appeal, Lee raises sixteen points for reversal.

The general standard of review for reviewing claims of ineffective assistance of counsel, as set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), has been stated many times. A defendant must show first, that counsel's performance "fell below an objective standard of reasonableness," *Strickland*, 466 U.S. at 688, and second, that the errors "actually had an adverse effect on the defense." *Id.* at 693.

We have repeatedly held that we will not reverse the trial court's denial of postconviction relief unless the trial court's findings are clearly against the preponderance of the evidence. *Norman v. State*, 339 Ark. 54, 2 S.W.3d 772 (1999). There is a strong presumption that trial counsel's conduct falls within the wide range of reasonable professional assistance, and a petitioner has the burden of overcoming this presumption by identifying specific acts or omissions of trial counsel which, when viewed from counsel's perspective at the time of the trial, could not have been the result of reasonable professional judgment. *Id.* (citing *Wainwright v. State*, 307 Ark. 569, 823 S.W.2d 449 (1992); *Dumond v. State*, 294 Ark. 379, 743 S.W.2d 779 (1988)). Furthermore, matters of trial tactics and strategy are not grounds for postconviction relief. *Id.* (citing *Vickers v. State*, 320 Ark. 437, 898 S.W.2d 26; *Leasure v. State*, 254 Ark. 961, 497 S.W.2d 1 (1973)). This latter principle is of particular importance in this case, as it is applicable and disposes of several of Lee's points.

Lee's first argument on appeal is that his Sixth Amendment right to conflict-free counsel was violated because the trial court refused to relieve Simpson and Qualls of the Pulaski County Public Defender's Office and appoint him new counsel. To better understand his arguments, a discussion of the facts leading up to Lee's trial is necessary. After Lee was charged with Reese's murder, he quickly became a suspect in several other crimes that had occurred in the Jacksonville area. He was eventually charged with a second

capital murder and with three counts of rape. Of the charges pending against him, the Reese murder was assigned to Pulaski County Circuit Court, Second Division; the other capital murder case was assigned to Seventh Division; and the three rape cases were assigned to First Division. Public Defender attorneys Simpson and Qualls were appointed to represent Lee in all five of these cases.

Lee was first tried for the murder of Debra Reese in 1994, and that trial ended in a hung jury; at the time, the other murder case and all three rape cases were still pending. On February 17, 1995, Lee, acting *pro se*, represented to First Division Judge Marion Humphrey that a conflict of interest existed between himself and his attorneys, and he requested that Simpson and Qualls be relieved as counsel in the First Division rape cases. Lee also voiced dissatisfaction with Simpson's and Qualls's refusals to call certain witnesses in his Second Division capital murder case; he also was upset because, after obtaining the mistrial in the Reese case, Simpson stated that Lee should have gotten the death penalty. After hearing Lee's and Simpson's testimony, but without articulating his reasons, Judge Humphrey found that a conflict existed. The judge granted Lee's request to relieve Simpson and Qualls from the First Division rape cases; he then appointed Dale Adams to represent Lee in the three rape cases.

After being removed from the First Division cases, Simpson filed motions in Second and Seventh Divisions, asking to be relieved in those murder cases as well. He argued that since a conflict had been found to exist in the First Division cases, a conflict necessarily existed in the Second and Seventh Division cases. Particularly, Simpson contended that the rape charges were going to be used against Lee in the murder trials — in Second Division, they would be introduced as aggravating factors during the penalty phase, and in Seventh Division, they would be used as evidence under Ark. R. Evid. 404(b).

On February 22, 1995, Second Division Judge Chris Piazza held a hearing on Simpson's and Qualls's motion to be relieved, and at the hearing's conclusion, Judge Piazza ruled that the conflict in First Division was "not going to affect this division. . . . Judge Humphrey cannot declare there is a conflict up there and have any bearing on this case." Another hearing was held on March 8, 1995, at which time Lee argued that he wished to have the Public

Defender attorneys removed from his case because they would not communicate with him, nor would they handle the case to his liking. Judge Piazza again refused to relieve Simpson or Qualls.

A third hearing was held on March 23, 1995. Simpson noted that there would be a problem of inconsistent strategies if he was required to continue representing Lee in the Second Division murder case. Once again, Judge Piazza refused to recognize that a conflict existed, and denied defense counsels' motion to be relieved. At yet another hearing on April 21, 1995, Simpson pointed out that he had received a copy of a complaint, bearing no file mark, which purportedly was a civil lawsuit against him by Lee. Simpson submitted that this complaint appeared to put him in a direct adversarial position with Lee. Simpson also asserted that Lee had refused to discuss the case or cooperate in any way the last two times they had attempted to visit about the case. Lee responded that he did not trust Simpson or Qualls. Judge Piazza, commenting on Lee's "pattern of obstruction," refused to find a conflict and again declined to relieve Simpson and Qualls.

Simpson subsequently filed a petition for writ of certiorari with our court on April 25, 1995, alleging that there was "an intolerable conflict between himself and [Lee]" and asking us to order Judge Piazza to relieve him and Qualls as defense counsel in the Second Division murder case. Our court, presented with only a partial record, declined to hold that Judge Piazza had "committed a plain, manifest, clear, great, or gross abuse of discretion in refusing to relieve the public defender." *Simpson v. Pulaski County Circuit Court*, 320 Ark. 468, 899 S.W.2d 50 (1995).

Lee's Second Division murder trial was set for May 15, 1995. At a pretrial hearing on May 12, Judge Piazza agreed to appoint Dale Adams to represent Lee during the penalty phase of his trial. At that point, the following colloquy was had between Lee, Simpson, Qualls, Adams, Holly Lodge (the deputy prosecutor), and Judge Piazza:

> THE COURT: [*Speaking to Lee*] It is my understanding that Mr. Adams and Mr. Simpson have conferred with you about this situation, and it is my understanding that *you intend to waive any conflict of interest and accept the situation as it exists. Is that correct?*
>
> MR. LEE: *Yes, it is.*

THE COURT: Mr. Adams, just for the record, you have discussed this with Mr. Lee?

MR. ADAMS: Yes I have, Your Honor. I have talked with him. Mr. Simpson has talked with him about what he is doing is waiving any possible error that might be in the trial by having me involved in this. *It is his statement that this is what he wants to do as long as we get it continued until sometime this fall where I will have sufficient time to prepare the mitigation.*

THE COURT: As far as any error in dealing with the conflict of interest?

MR. ADAMS: Yes, that's correct.

THE COURT: Mr. Simpson, that's your understanding also?

MR. SIMPSON: Yes, Your Honor.

THE COURT: That's your understanding, Mr. Lee?

*MR. LEE: Yes, it is.*

*Ms. Lodge: Mr. Lee, you are perfectly satisfied with Mr. Simpson defending you in the guilt phase of this trial?*

*MR. LEE: Yes, I am.*

MS. LODGE: Your Honor, I want to make sure the record is clear there's not any coercion here, anything like that going on. This isn't an ultimatum. This is a voluntary intelligent choice. We are not putting him in a predicament, it is this or nothing. *I want this amply clear this is a voluntary choice at this point, something we can stick with when he changes his mind two weeks from now.*

*THE COURT: Mr. Lee, you understand that?*

*MR. LEE: Yes, I understand.*

*THE COURT: This is a free and voluntary choice on your part?*

*MR. LEE: Yes, it is.*

THE COURT: I have a feeling there's nothing you ever do that's not free and voluntary. I want to make sure that's on the record. I will make a docket entry showing Mr. Adams appointed for the penalty phase. Mr. Lee has waived the conflict of interest, and the Public Defender will continue in this case.

(Emphasis added.)

In accordance with everyone's agreement, Judge Piazza then continued Lee's trial to October 9, 1995. Immediately prior to the beginning of trial, Lee attempted to reassert his conflict-of-interest argument, and again generally argued that he and Simpson had a conflict and that he was not satisfied with Simpson. Lee added that, when he previously sought a writ of certiorari from this court due to the alleged conflict-of-interest issue, Judge Piazza improperly sent a letter to Chief Justice Jack Holt stating that Lee's petition should be denied.[1] Judge Piazza ruled that Lee had waited until the day of trial to once again raise the issue and that Lee's actions were "ridiculous." The case then proceeded to trial, with Simpson and Qualls representing Lee in the guilt phase of the trial, and Adams handling voir dire and the sentencing phase for Lee. The jury convicted Lee of capital murder and sentenced him to death by lethal injection.

■ On appeal, Lee argues that, pursuant to *Holloway v. Arkansas*, 435 U.S. 475 (1978), Judge Piazza had a duty to either relieve Simpson and Qualls, or take "adequate steps" and conduct a "searching review [and] thorough inquiry" into the assertions that a conflict existed. He contends that *Holloway* mandates an automatic reversal when an actual conflict exists which had an adverse effect on counsel's performance. The difficulty with Lee's argument, however, is that he clearly waived any conflict of interest that might have existed. Lee explicitly stated that he was satisfied with Simpson and Qualls defending him in the guilt phase of the trial, and he expressed to the court that his waiver of any conflict of interest was a free and voluntary choice on his part. Although Lee attempted to raise the issue again before his second trial started, we have held that a defendant cannot be allowed to abort or frustrate the process of justice by his own actions. *See Morgan v. State*, 308 Ark. 627, 826 S.W.2d 271 (1992).

■ Here, Lee had previously expressed in clear terms why he believed he and the public defender's counsel had a conflict of interest, but he also intelligently and voluntarily waived any such

---

[1] While the record reflects Judge Piazza wrote Chief Justice Holt a letter, the letter was hardly an *ex parte* missive since copies were furnished to all counsel and also all circuit judges with the expressed purpose of obtaining counsel to represent Judge Piazza on the conflict-of-interest issue then pending before this court.

conflict, which he had every right to do.[2] Moreover, in *Myers v. State*, 333 Ark. 706, 972 S.W.2d 227 (1998), we held that where the defendant declared that he was satisfied with the services rendered by his attorney, and the alleged conflict of interest was not brought to the attention of the court until the Rule 37 petition, the conflict was waived. Here, of course, the claimed conflict was asserted before trial, but Lee did not raise the issue again until he filed his petition for postconviction relief. Because Lee waived the alleged conflict of interest prior to his trial and he failed to raise this issue on direct appeal, we refuse to consider Lee's arguments on this point now.

Lee's second point on appeal[3] is that trial counsel was ineffective for failing to call a number of alibi witnesses who had testified at his first trial. Specifically, Lee contends that his counsel, Mr. Qualls, should have called Stella Young, Lee's mother, during the guilt phase, and that Dale Adams should have called Sheila Dodson, Lee's then-girlfriend, during the sentencing phase. At the Rule 37 hearing, both of these witnesses testified that they were present at the second trial and were available to testify consistently with the statements they made during the first trial, which resulted in a mistrial.

When asked why he did not call Stella Young at the second trial, Qualls responded that he had considered it, and indeed had

---

[2] We note that we have thoroughly read the record upon which Judge Humphrey ruled a conflict of interest existed between Lee and counsel Simpson and Qualls, but we are unclear of the reason(s) upon which the judge made his ruling. Because Lee waived whatever conflict could have existed, we need not reach the merits of whether a conflict of interest in fact occurred between Lee and his defense counsel. The standard for determining whether a defendant received ineffective assistance of counsel because of a conflict of interest was set out in *Sheridan v. State*, 331 Ark. 1, 959 S.W.2d 29 (1998):

> Prejudice will be presumed from a conflict of interest only when the defendant demonstrates that an actual conflict of interest adversely affected his lawyer's performance. Petitioner has the burden of proving a conflict of interest and showing its adverse effects. A petitioner is not entitled to relief . . . unless he satisfies both prongs of the test. The prejudice must be real and have some demonstrable detrimental effect and not merely have some abstract or theoretical effect.

*Sheridan*, 331 Ark. at 4-5 (quoting from *Johnson v. State*, 321 Ark. 117, 900 S.W.2d 940 (1995) (internal quotations and citations omitted).

[3] Lee's brief actually contains only four numbered points on appeal. His second point actually consists of thirteen individual issues, which makes a total of sixteen points on appeal. For ease of reading, we will number his points one through sixteen.

said during his opening statements that he would call her. However, after discussing the situation with Simpson and with Lee, they agreed that they should not call any witnesses. Qualls also stated that he did not feel that Young's testimony had helped Lee before the jury at the first trial; in addition, he and Simpson felt that the State's case was not as strong during the second trial, and they did not want to put on any evidence that the State could attack or impeach.

Dale Adams was also questioned about his decision not to call Sheila Dodson. At sentencing at the second trial, the State introduced evidence that Lee had raped a Jacksonville woman. During the first trial, Adams had called Dodson to testify that she was on the phone talking to Lee at the time the rape was supposed to have occurred. However, Adams testified at the Rule 37 hearing that Lee and his family had "talked him into" putting Dodson on as a witness at the first trial, but after the trial was over, the prosecutor sardonically thanked Adams for having called Dodson, because her testimony allowed the State to introduce damaging rebuttal testimony. For this reason, Adams chose not to "make that mistake again" by calling Dodson in the second trial.

■ This court has held that an attorney's decision not to call a particular witness is largely a matter of professional judgment, and the fact that there was a witness or witnesses who could have offered testimony beneficial to the defense is not, itself, proof of counsel's ineffectiveness. *Helton v. State*, 325 Ark. 140, 924 S.W.2d 239 (1996) (citing *Dumond v. State*, 294 Ark. 379, 743 S.W.2d 779 (1988)). Moreover, Rule 37 does not provide a forum to debate trial tactics or strategy, even if that strategy proves improvident. *Id.* (citing *Watson v. State*, 282 Ark. 246, 667 S.W.2d 953 (1984)).

■ In deciding not to call Young and Dodson as witnesses, trial counsel weighed the options and clearly made strategic, tactical decisions, based in large part on their experiences with having already tried the case the first time around. In addition, after the State rested, the trial judge spoke to Lee, Qualls, Simpson, and Adams, and commented that the attorneys had all conversed with Lee and his family and that they had concurred in the decision to rest at the conclusion of the State's case; Lee responded, "Yes sir, that's correct." The Court then asked, "You've discussed with them your right to testify and what the implications are?" Lee replied, "Yes sir." It is clear, then, that trial counsel made a strategic

call with which Lee agreed. Lee's belated disagreement with his attorneys' decisions on calling witnesses cannot serve as a basis for granting postconviction relief. *See Helton, supra.*

Lee's next contention is that trial counsel unreasonably failed to present testimony and evidence at trial that would have shown that he had an income and thus a lack of a motive to rob. When Debra Reese's body was found, her purse was missing money, thus one of the aggravators introduced at Lee's capital murder trial was that the murder was committed for pecuniary gain. Other evidence showed that Lee had made a payment on rental furniture at a Jacksonville Rent-A-Center with a $100 bill that was only two serial numbers away from another bill found in Reese's house. Lee argues now that counsel should have rebutted this robbery aggravator with evidence that he had an income earned from his job, and that he was to receive a tax refund in excess of $1,500.

Simpson testified at the Rule 37 hearing that, before the second trial, he had investigated and confirmed Lee's assertions that he had money. Simpson chose not to present that evidence because he did not believe it was a very good explanation of why Lee did not commit the murder, especially since the State's proof reasonably and inferentially showed Lee had spent a $100 bill that had been in Reese's possession at the time she was murdered. Again, this is a question of trial strategy, which cannot serve as the basis for relief under Rule 37. *See Dunham v. State,* 315 Ark. 580, 868 S.W.2d 496 (1994).

For his fourth point, Lee argues that counsel was ineffective for failing to highlight the absence of blood on his person or clothing. Lee argues that Qualls failed to call attention to the fact that two witnesses testified that they saw Lee shortly after the murder was alleged to have happened, and neither of them saw blood on his clothing. Lee claims that this testimony, coupled with the crime scene photos, which showed that it was a very bloody murder, would have helped exonerate him, and that his attorneys were therefore ineffective in failing to present it.

Andy Gomez and Glenda Pruitt were the two witnesses who testified that they did not see blood on Lee shortly after the murder. In his closing argument, Simpson emphasized the point

that neither of these witnesses saw blood on Lee.: "Did Mr. Gomez . . . see any blood on this black male[?] . . . . [He said] 'No I didn't.' . . . Glenda Pruitt, who said she got within two feet of him, 'Did you see any blood on [Lee]?' 'No, no blood.' She and Andy Gomez both say there's no blood." It is difficult to see what else defense counsel could have done, short of opening the door to genuinely damaging testimony about the blood on the jacket Lee was seen wearing on the day of Reese's murder. Once again, this is a matter of trial tactics, and provides no ground for relief.

In addition, Simpson testified at the Rule 37 hearing that he and Qualls wanted to keep out the fact that Lee had a small amount of blood on his shoes, and that they had considered showing Lee's jeans to the jury, to demonstrate that they did not have blood on them. However, he said that they did not want to open the door about the fact that Lee had blood on his shoes. Simpson stated that "[s]howing [the jeans] to the jury and pointing out the absence of blood on these clothes might have opened the door to evidence of blood on Ledell's shoes[.]"[4] In addition, Simpson noted that human blood had been found on a jacket that was similar to the one identified by Andy Gomez (one of the witnesses Lee claims counsel should have examined further about the blood). That jacket was found being worn by Lee's mother the day of the murder, and it had blood on it. Simpson testified that he and Qualls had successfully excluded the evidence about the jacket with a motion in limine, and they did not want to take a chance of waiving their motion by introducing other blood evidence.

In his next point on appeal, Lee claims that Dale Adams was ineffective during the penalty phase for failing to challenge the State's aggravating circumstances. At sentencing, the State introduced evidence related to Lee's three rape charges,[5] on which Adams represented Lee in First Division. Lee assigns error to Adams's failure to 1) cross-examine J.P. as extensively as Adams did during the J.P. rape trial; 2) present proof that the hair and fingerprints taken from the scene of the L.D. rape did not match Lee's;

---

[4] Although Simpson stated that he wanted to keep the shoes out of evidence, the shoes were in fact introduced as State's Exhibit 47, and Kermit Channell of the State Crime Lab testified that there was a pinhead-sized spot of human blood on the left shoe and a very small spot of blood on the right shoe. We read Simpson's remarks to mean that he wanted to avoid any additional emphasis on the fact that there was human blood on the shoes.

[5] We denominate these cases with the initials of the victims: J.P., L.D., and A.S.

and 3) avoid opening the door for an in-court identification by the third rape victim, A.S.

First, Lee claims that Adams should have cross-examined J.P. more vigorously and pointed out inconsistencies in her testimony. During the Rule 37 hearing, Adams testified that he did not do so because the State's next witness was an employee of the circuit clerk's office, who presented the records from the J.P. rape trial that showed Lee was convicted of raping and kidnapping J.P. Because the jury was going to find out from the next witness that Lee had been convicted of rape, Adams stated that it would only have made the jury angry to "argue with the victim" about details of the rape case. He was able, however, to cross-examine J.P. and show that her identification of Lee as being her assailant was wrong when she described Lee as being only a couple of inches taller than J.P. This was a tactical decision by Adams, which once again does not provide grounds for relief under Rule 37.

With respect to L.D., Lee argues that Adams mounted no defense at all to her testimony about her rape; in particular, Lee asserts that Adams should have presented exculpatory proof as well as cross-examined her as thoroughly as he had during the initial rape trial. During the murder trial, Adams questioned L.D. about her inability to identify her attacker. Nonetheless, Lee contends that Adams's strategy was "objectively unreasonable," but beyond that, he only offers a bare assertion that "but for counsel's failure, there is a reasonable probability that the jury would have found this aggravator lacking." This statement is not only conclusory, but also it disregards the fact that even without L.D.'s rape as an aggravator, there was still evidence of the two other rapes and the fact that Reese's murder was committed for pecuniary gain. Thus, it is not likely that, in the absence of this aggravating factor, the jury would not have imposed the death penalty. *See, e.g., Jones v. State*, 340 Ark. 390, 10 S.W.3d 449 (2000).

Finally, Lee argues that Adams was ineffective in his cross-examination of State witness A.S. He asked A.S., "[Y]ou've never been able to identify the man that did this to you, have you?" Adams asked the question because A.S. had never previously identified anyone in a lineup or photo spread, and Adams thought he could show A.S. had never identified Lee as her attacker. However, A.S. unexpectedly made an in-court identification of Lee as being

her assailant. Certainly, Adams's strategy appeared reasonable, and we have held that Rule 37 does not provide a forum to debate trial tactics or strategy, even if that strategy proves improvident. *Helton*, 325 Ark. at 147.

 Lee's sixth argument is that counsel was ineffective for failing to offer, as a mitigating circumstance, the fact that the State had made him an offer of life imprisonment without parole in exchange for a guilty plea. In support of this contention, he cites *Cook v. State*, 369 So. 2d 1251 (Ala. 1978), which he describes as holding that an offer of life without parole constitutes a mitigating factor. That was not the holding in *Cook*. The statement to which Lee refers is found in a concurring opinion, which expresses that justice's opinion that the trial court should have considered the State's offer to the defendant as a mitigator. The majority holding in *Cook* makes no mention of this offer. Lee, however, asserts that defense counsel knew about this case and should have argued it. At the Rule 37 hearing, Dale Adams testified that he considered arguing this case and bringing up the offer as a mitigator, but he decided not to do so because he "[didn't] think that's a true mitigator. [Adams thought] it would have been objected to by the State and probably sustained by the Court." Counsel cannot be deemed ineffective for not raising every novel issue which might conceivably be raised. *See Weaver v. State*, 339 Ark. 97, 102, 3 S.W.3d 323 (1999) (citing *Ruff v. Armontrout*, 77 F.3d 265 (8th Cir. 1996)).

Next, Lee contends that his attorneys were ineffective for failing to move to quash the jury panel, move for a mistrial, or seek some other remedial measure to counteract the pretrial publicity his case had engendered. However, although he presented evidence at the Rule 37 hearing that there was indeed a good deal of publicity, Lee failed to offer the testimony of any juror who might have said that he or she was in any way influenced or prejudiced by the publicity.

 The decision of whether to seek a change of venue is largely a matter of trial strategy and therefore not an issue to be debated under our postconviction rule. *Huls v. State*, 301 Ark. 572, 785 S.W.2d 467 (1990) (citing *Neff v. State*, 287 Ark. 88, 696 S.W.2d 736 (1985)). To establish that the failure to seek a change in venue amounted to ineffective assistance of counsel, a petitioner must offer some basis on which to conclude that an impartial jury

was not empaneled. *Id.* Jurors are presumed unbiased, and the burden of demonstrating actual bias is on the petitioner. *Id.* (citing *Linell v. State*, 283 Ark. 162, 671 S.W.2d 741 (1984); *Jeffers v. State*, 280 Ark. 458, 658 S.W.2d 869 (1983)). A defendant is not entitled to a jury totally ignorant of the facts of a case, *id.* (citing *Richardson v. State*, 292 Ark. 140, 728 S.W.2d 189 (1987)), and he is not entitled to a perfect trial, only a fair one. *Id.* (citing *Hoback v. State*, 286 Ark. 153, 689 S.W.2d 569 (1985)).

██ In addition to the fact that Lee did not present any evidence that any juror was actually prejudiced, there was also the testimony of Simpson that he and the rest of the defense team considered filing a motion for change of venue, but decided that their chances would probably be better in Pulaski County, as opposed to Perry County, the only other county in the Sixth Judicial District. This is a question of trial strategy, and it does not provide a basis for relief under Rule 37.

Lee's eighth point on appeal is that counsel was ineffective for failing to object to certain testimony about Lee's alleged use of crack cocaine. Glenda Pruitt was called as a witness to testify that she had seen Lee around noon on the day of the murder, which was shortly after the murder occurred. Lee argues that it was ineffective for Qualls to fail to object when the State first questioned Pruitt about a conversation she had with Lee wherein he told her that he liked crack cocaine. In addition, Lee urges that Qualls only made matters worse when he pursued the line of questioning on cross-examination, when he asked her what she meant when she asked Lee, "Where's the fire?"[6] On redirect, in response to these questions, the State asked Pruitt what she had said after Lee told her he preferred crack; she said that, when she asked him if he had it "running all through [his] veins," he answered, "Yes, it is running all through me."

During the Rule 37 hearing, Qualls testified that he pursued these questions because he wanted to investigate Pruitt's own use of drugs in order to discredit her testimony. He stated that he believed they "needed to attack the witness . . . by showing she's a drug user,

---

[6] Pruitt's testimony had been that, as Lee hurried past her yard that morning, she asked him, "Where's the fire?" According to her, he responded, "Well, you are always asking me for weed" and "I told you, I don't like that." He then told her that he preferred crack cocaine.

and in spite of all this coming in, we felt the benefit to be gained by attacking her as a drug user was worth the detriment, and we kind of expected the whole thing to come in once we got in it. But we felt like we should attack the woman on her drug use."

Once again, this is clearly a matter of trial strategy. Qualls balanced the alternatives and concluded that attacking Pruitt's credibility as a drug user would result in more good than the harm that could occur by opening the door to Lee's drug use. As noted above, the fact that a choice of trial strategy later proves improvident does not amount to ineffective assistance of counsel.

■ Next, Lee accuses counsel of ineffective assistance in their failure to seek a mistrial when a juror was seen leaving the judge's chambers during jury deliberations. The juror in question was seen entering the judge's chambers and exiting some fifteen to twenty minutes later. Stella Young testified at the Rule 37 hearing that when she informed Qualls about the juror's actions, he told her that the juror was merely using the telephone. Because the judge was seen exiting the chambers after the juror left, Lee concludes that there was improper contact between the juror and the judge, which should have resulted in a motion for mistrial. Additionally, he contends that he should be excused from having to show prejudice from this event because such a showing would be "impossible."

■ Neither Young nor any other witness testified as to what occurred in the judge's chambers. Judge Piazza testified during the Rule 37 hearing, but Lee did not ask him about the juror. Although Lee claims it is "impossible" to show prejudice in this situation, Lee could have easily asked Judge Piazza about the incident since the judge testified. Lee has failed to meet his burden under *Strickland*, and this point, too, must be rejected.

Lee's tenth point is that counsel unreasonably failed to support their motion to prohibit the use of voter registration records to select the jury panel. Prior to trial, Simpson and Qualls had filed such a motion, arguing that the use of voter registration records systematically underrepresented blacks, women, and other cognizable groups from service on jury panels. The trial court rejected the motion, saying that counsel had failed to support it with any expert testimony; this court affirmed that ruling on direct appeal. How-

ever, in holding that Lee had failed to present any proof as to the number of African-Americans on every jury venire in Pulaski County, this court also went on to note that there was no possibility of systematic or purposeful exclusion of any group in the jury selection process, because it was an entirely random selection procedure. *Lee*, 327 Ark. at 699.

Lee has simply failed to argue at all how he was prejudiced by his counsels' actions with respect to this issue. He has not asserted that he was prejudiced, let alone attempted to demonstrate *how* he might have been prejudiced. Thus, he has failed to meet the *Strickland* test's requirement that the defendant show that "the deficient performance prejudiced the defense," and this point as such presents no grounds for relief. Moreover, this court has long upheld the use of voter registration records for jury selection. *See, e.g., Mitchell v. State*, 299 Ark. 566, 776 S.W.2d 332 (1989). It is not ineffective assistance of counsel to fail to raise an objection when there is no chance it will be sustained. *Catlett v. State*, 331 Ark. 270, 962 S.W.2d 313 (1998).

For his eleventh point, Lee argues that his attorneys were ineffective because they failed to investigate the personal relationship between Judge Piazza and Deputy Prosecuting Attorney Melody LaRue. Here, however, he concedes that Simpson and Qualls testified at the Rule 37 hearing that they were not aware of the relationship and that no one associated with the State informed them that such a relationship might have existed. Nevertheless, he urges that he is entitled to relief because of trial counsels' failure to investigate the issue. Once again, Lee offers no evidence that would support his contention that this was an "error[] so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. When his attorneys did not know about the relationship, it could not have been ineffective assistance for them to fail to investigate that relationship.

Lee's twelfth point on appeal is that, during the penalty phase, counsel was ineffective for failing to object to improper closing remarks. After the penalty phase of Lee's capital murder trial, the prosecutor offered closing arguments in which she said that Lee "is a hunter. [Jacksonville] is his habitat. And his prey were the people of Jacksonville from 1990 to 1993. And the people of Jacksonville

didn't even know they were being hunted. . . . He is a hunter." When Dale Adams offered his closing statements, he asked the jury "Who are we then to say that we are going to kill Ledell Lee?" The prosecutor then re-addressed the jury, saying "Mr. Adams . . . says, who are we, referring to us, I guess, referring to you specifically as jurors, who are we to determine when a life should be taken? Ladies and gentlemen, I will tell you who we are. We are the hunted." Adams offered no objection during any of this.

Lee now argues that Adams's failure to object was ineffective; he points out that Adams agreed at the Rule 37 hearing that he should have objected, and would have if he had heard the statements, but he "just missed it." Lee contends that these remarks were "deliberately calculated to create intense fear in the mind of each and every juror." The judge hearing the Rule 37 petition ruled that these comments were indeed improper, but he concluded that it was not a comment which would have inflamed the passion of the jury to such a degree that the outcome of the proceeding would have been any different had the remark not been made, or had been objected to, and the jury admonished to disregard it. We cannot say that this conclusion is erroneous.

■ Ordinarily, the failure to object during closing argument is within the wide range of permissible professional legal conduct. *Sasser v. State*, 338 Ark. 375, 993 S.W.2d 901 (1999). This court has held that experienced counsel in any case could disagree as to the influence a particular closing argument had on the jury's verdict. *Hayes v. State*, 280 Ark. 509, 660 S.W.2d 648 (1983). Before a petitioner can prevail on an allegation that counsel was wrong in not objecting during closing argument, he must establish that he was denied a fair trial by the failure to object. *Id.*

■ Here, Dale Adams testified that he would have objected if he had heard the statement. Since he did not hear the comment, his failure to object cannot necessarily be labeled "trial strategy." Nonetheless, it was unlikely that, even if Adams had heard the statements and objected, the trial court would have granted a mistrial. Mistrial, of course, is a drastic remedy, to be granted only when there has been an error so prejudicial that justice cannot be served by continuing the trial. *See, e.g., Kemp v. State*, 324 Ark. 178, 919 S.W.2d 943 (1996). Given the nature and strong evidence of guilt the jury had already heard, both during the guilt

phase and the sentencing portion of Lee's trial, it is unlikely that the additional comment — albeit an objectionable comment — was the determining factor in the jury's decision to impose the death penalty on Lee. When a defendant challenges a sentence of death, "the question is whether there is a reasonable probability that, absent the errors, the sentencers . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. Although the prosecutor's statements were improper, when taken along with the evidence already presented to the jury, we do not believe there to be a reasonable probability that, absent these statements, the jury would not have sentenced Lee to death.

▆▆▆▆▆ Next, Lee argues that his attorneys were ineffective because they failed to advance "the correct theory" to support their objection to the State's use of victim-impact evidence. Lee submits that his attorneys should have argued that such evidence was irrelevant based on the concurring opinion in *Lee v. State*, 327 Ark.692, 942 S.W.2d 231 (1997). That concurrence criticized the use of victim-impact testimony, suggesting that while such evidence may be permissible, it still must be relevant before it is admissible. Lee now argues that counsel was ineffective for failing to raise the relevancy issue on direct appeal. He does not mention, however, that at the time of his trial, there was already authority that approved the use of victim-impact evidence. *See, e.g.*, *Nooner v. State*, 322 Ark. 87, 907 S.W.2d 677 (1995); *Watkins v. State*, 320 Ark. 165, 895 S.W.2d 532 (1995). It is therefore likely that, even if counsel had made such an objection, the trial court would have rejected it on the basis of this court's other opinions approving the use of victim-impact testimony. It is not ineffective assistance of counsel to fail to make a meritless objection, *Trimble v. State*, 336 Ark. 437, 986 S.W.2d 293 (1999), therefore, this argument does not present a basis for relief.

In the last of Lee's points alleging ineffective assistance of counsel during the guilt and sentencing phases of his trial, Lee contends that his attorneys should have raised an argument that the inordinate amount of time condemned inmates spend on death row violates the Eighth Amendment's prohibition against cruel and unusual punishment. Citing *Lackey v. Texas*, 514 U.S. 1045 (1995), Lee urges that counsel unreasonably failed to raise this claim. *Lackey* was a memorandum opinion, written by Justice Stevens

upon the Supreme Court's denial of certiorari in an appeal raising the question described above. Justice Stevens opined that the *claim was novel*, but not without foundation, and he noted that the Court's denial of certiorari would leave the "important" issue "undecided." (Emphasis added.)

 No Arkansas case has ever cited or approved the point mentioned in the *Lackey* opinion. We have decided one case that considered the length of time spent on death row, *Hill v. State*, 331 Ark. 312, 962 S.W.2d 762(1998), but that opinion concludes that "we know of no reason why we should now hold that the imposition of the death penalty is cruel and unusual punishment merely because there has been an extended passage of time between the crime and the punishment." *Hill*, 331 Ark. at 322-23. Thus, even if Lee's attorneys had raised the "*Lackey* challenge" urged by Lee, there is no indication that the trial court would have granted it or even considered it. It would have been a novel claim, which counsel is not ineffective for failing to raise.

Lee's penultimate point on appeal is that he was denied due process and a fair trial by the trial court's refusal to recuse based upon his relationship with the deputy prosecuting attorney. He contends that testimony by Pat Piazza, the judge's ex-wife, established that the relationship between Judge Piazza and Melody LaRue began at least as early as 1995, and that, because of the relationship, Judge Piazza had a duty to recuse from Lee's trial.

 We reject Lee's arguments for two reasons. First, the trial judge's failure to recuse is an issue that should have been raised on direct appeal. Second, however, the Rule 37 court heard testimony from parties on both sides of the issue, and concluded that Lee had not proven that there was in fact a relationship between Judge Piazza and Melody LaRue at the time of Lee's trial. Although Pat Piazza testified that the relationship began in 1995, Judge Piazza stated that his relationship with LaRue did not begin until the spring of 1996, after Lee's trial was over. Having seen and heard both witnesses at the Rule 37 hearing, that court made a credibility determination and concluded that the existence of a relationship prior to October of 1995, when Lee was tried, had not been proven. This court defers to a trial court's determinations of credibility on Rule 37 appeals, *see Myers*, 333 Ark. 706, 972 S.W.2d

227, and therefore, this assertion does not warrant the granting of relief.

■■ Finally, Lee asserts that he is entitled to relief under the cumulative-error doctrine, because 1) defense counsel did not argue at trial that the cumulative effect of all the errors committed in those proceedings entitled him to relief; and 2) the cumulative effect of the errors committed by defense counsel in the guilt and penalty phase of his murder trial entitles him to relief. In *Noel v. State*, 331 Ark. 79, 960 S.W.2d 439 (1998), this court held that a reversal of a conviction based on cumulative error is only appropriate in rare and egregious cases. There, the defendant had not identified any errors committed during the trial that would have justified relief under the cumulative-error doctrine, either at trial or on appeal. Consequently, the *Noel* court held that the defendant had not shown that trial counsel were ineffective for failing to request relief from the trial court based on cumulative error, or to argue that theory on appeal. Here, likewise, Lee has not identified any errors committed during trial or on appeal; rather, he maintains in a conclusory fashion that he is entitled to relief. Such conclusory allegations cannot be a basis for relief. Sasser v. State, 338 Ark. 375, 993 S.W.2d 901 (1999). As in Noel, we hold that Lee has not demonstrated that his counsel's performance was so deficient as to fail under the Sixth Amendment, and thus, we deny his request for relief on this point, as we do on all the others.

Affirmed.