Leslie PRICE *v.* STATE of Arkansas

CR 01-703 66 S.W.3d 653

Supreme Court of Arkansas
Opinion delivered February 21, 2002
[Petition for rehearing denied March 21, 2002.]

---

*Etoch & Halbert Law Firm*, by: *Louis A. Etoch*, for appellant.

*Mark Pryor*, Att'y Gen., by: *Brad Newman*, Ass't Att'y Gen., for appellee.

ROBERT L. BROWN, Justice. Appellant Leslie Price appeals his judgment of conviction for second-degree murder and felon in possession of a firearm (felon-firearm). He was sentenced to thirty years on the former offense and twenty-five years on the latter, with the two sentences to run concurrently. He raises two points on appeal: (1) the circuit court erred in not directing a verdict in his favor on the second-degree murder charge due to insufficient evidence; and (2) the circuit court erred in not granting his motion for a new trial, because of his trial counsel's conflict of interest and ineffective assistance of counsel. We affirm the judgment of conviction.

On the evening of October 22, 1999, Price, age 43, was working at the Onyx Club in Hot Springs. The club was owned and operated by Price's wife and his mother-in-law. Price was regarded as the manager of the club. His job was to control the crowd both at the door and inside the club. Patrons of the club were required to be twenty-five years of age, and part of Price's job was to ensure that people entering the club were old enough.

On the evening in question, a large crowd of about eighty people was present in the club. Price was working at the door, checking the patrons for identification, and making sure that all guests signed the guest book as they entered. Fred Sykes, the victim in this case, arrived at the club at about midnight with his mother, Margie Walker, and his girlfriend of six months, Julia Sellers. Sellers' mother, Janice Clark, was also present at the club. Sellers was pregnant with Sykes's child, and the group was celebrating this news. Before coming to the club, Sykes had been drinking gin and cranberry juice.

What happened next was disputed at trial. According to Sellers, when Sykes, Walker, and she arrived at the club, she remained outside for some time talking to friends. She testified that Sykes and one of his friends entered the club despite the fact that Sykes was too young. She also testified that eventually she entered the club as well. Several minutes later, she saw Price forcing Sykes to leave the club. She testified that this was when the altercation began that led to Sykes's being shot.

According to Sellers, after Price asked Sykes to leave, Sykes and she left the club. While they were standing on the sidewalk in front of the club, Margie Walker came out of the club. She tripped on a curb and was lying down with one leg in the street when Sellers walked over to help her up. At this point, according to Sellers, Price came out of the club with a gun in his hand and walked rapidly toward Sykes. Seeing this, Sellers and her mother approached the two men, and Sellers stepped between them. The next thing that happened, according to Sellers, was Price grabbed Sykes by his jacket collar and pointed the gun at his face as the two men stared at each other. According to Sellers, "[H]e stared at [Sykes] and then he looked him straight in the face and then he just shot him."

Price testified to a different chain of events, beginning at the time when Sykes arrived at the club. According to Price, when Sykes arrived, he remained outside and asked Price to go inside and find his mother. Price testified that this encounter was relatively friendly and that he was about to do as Sykes asked, but before he got a chance to find Walker, she appeared in the doorway. Price testified that at some point later, Sykes got into the club unbeknownst to Price, who was not supposed to have let him enter because he was not old enough. According to Price, Sykes then left the club.

Price testified that a short while later, Sykes approached him at the front door and asked if he could go inside and get Sellers. Earlier, Price had told him that he did not think Sellers was inside, but at that moment, she appeared at the door. Sykes and Sellers then had an argument, and Price testified that Sykes slapped her "clean out the door." According to Price's testimony, Sykes approached him just inside the club and confronted him angrily about Price's earlier statement that Sellers was not inside. Price ignored him and lit a cigarette, which Sykes slapped out of his mouth. At this point, Margie Walker came and took him outside onto the sidewalk.

Once Sykes was outside, according to Price, there was a disturbance in the area immediately in front of the club. Price could hear the commotion, and someone told him that Margie Walker was lying on her back on the sidewalk. He went outside to investigate. Before he got out of the club's front door, one of Price's friends handed him a gun. Price testified that he took the gun because he did not know what he would be facing once outside.

When he got outside, Price testified that he saw Walker lying on the ground, and Sellers and her mother were trying to help her to her feet. Sykes was acting erratically and approached Price, apparently still angry that Price had told him that Sellers was not inside the club. Price asked Sykes what had happened to Walker, and Sykes began cursing and screaming at Price. According to Price, Sykes took off his jacket and was grabbing for Price's shirt. Price then grabbed Sykes's left arm. Price felt something hit his finger, and he raised the gun. The gun fired accidentally, and the recoil knocked the gun out of his hand. The bullet hit Sykes. Price testified that he never intended to kill Sykes, and that the shooting was a result of his bad judgment.

The facts surrounding the immediate aftermath of the shooting are not as sharply contested as those leading up to the shooting. After Sykes was shot, Sellers, her mother, and Margie Walker assisted him down the street, as Sykes apparently could walk a short distance. The four of them spotted a Hot Springs police patrol cruiser that had pulled a car over. They approached the policeman, who called an ambulance. Sykes was taken by ambulance to National Park Hospital, where he died from the gunshot wound.

Dr. Frank Peretti was the medical examiner in this case and testified that the bullet entered Sykes's left cheek, exited on the left side of the neck, and then reentered Sykes's body through his left shoulder. The bullet passed through Sykes's left lung and eventually lodged in the soft tissues near his spine. The cause of death was the gunshot wound to the head and chest. It was later determined that Price had broken two bones in his hand, and his hand was placed in a cast. Price was taken to the Hot Springs police station, where he gave a statement. The gun with which Sykes was shot was never found.

On December 6, 1999, Price was charged with second-degree murder and felon-firearm. He was also charged as a habitual offender. Price hired Steve Oliver as his defense attorney. In the year 2000, Oliver ran for prosecuting attorney for the judicial circuit that is composed solely of Garland County, which includes Hot Springs. Oliver ran a contested race in both the primary election in May 2000 and the general election in November 2000. The general election was held on November 7, 2000. He won both races and was sworn in as prosecuting attorney on January 1, 2001.

Oliver filed several pretrial motions on Price's behalf and obtained several continuances of the trial. On September 11, 2000,

he filed a motion for a severance of Price's two charged offenses. On September 18, 2000, he filed a motion for continuance. The trial was set to begin the next day, September 19, 2000, and the circuit court held a hearing on the motion. At the motion hearing, Oliver and the deputy prosecuting attorney, Dan Turner, explained to the judge that the state had agreed not to oppose the motion for continuance in return for Oliver's withdrawing the motion to sever. The court agreed and granted the continuance, and the motion to sever was withdrawn.

From November 20 through the 22, 2000, the two charges against Price were tried before a jury. At the trial, the prosecutor presented the testimony of multiple witnesses, including Julia Sellers. The defense presented the testimony of several witnesses including Price's mother and Price himself. The jury was instructed on the two charges and returned a guilty verdict.

During the sentencing phase of the trial, the prosecutor introduced proof of three of Price's four prior convictions: a 1979 conviction for battery and two convictions for felon-firearm, one in 1983 and one in 1989. The fourth offense was admitted during the guilt phase of the trial. Price was sentenced to thirty years on second-degree murder and twenty-five years on felon-firearm, with the sentences to run concurrently.

After Price was convicted and sentenced, Oliver immediately withdrew as counsel in the case. Price hired a new attorney, Louis Etoch. Etoch timely filed a motion for a new trial based on Oliver's alleged conflict of interest and ineffective assistance of counsel at trial. At the ensuing motion hearing, Oliver testified that he spent a great deal of time and money campaigning for the position of prosecutor and that he ran on a platform of aggressive prosecution. He testified that when he made the decision to file as a candidate for the office, he informed Price of his decision. Oliver also testified that he continued to represent Price, but that Price did not seek independent counsel to advise him on any possible conflict of interest. Oliver further testified that if he had persisted in the motion to sever the charges of second-degree murder and the felon-firearm charge, the motion would have been granted. The circuit court denied the motion for a new trial.

## I. Sufficiency of the Evidence

Price's first argument on appeal is that the evidence of his mental state was insufficient to support a conviction for second-degree murder. We disagree.

We address the issue of sufficiency of the evidence first because of the double-jeopardy implications. *Haynes v. State*, 346 Ark. 388, 58 S.W.3d 336 (2001); *Cox v. State*, 345 Ark. 391, 47 S.W.3d 244 (2001). We treat a motion for a directed verdict as a challenge to the sufficiency of the evidence. *Burmingham v. State*, 342 Ark. 95, 27 S.W.3d 351 (2000); *Johnson v. State*, 326 Ark. 3, 929 S.W.2d 707 (1996); *Penn v. State*, 319 Ark. 739, 894 S.W.2d 597 (1995). This court has repeatedly held that in reviewing a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the State and consider only the evidence that supports the verdict. *Williams v. State*, 346 Ark. 304, 57 S.W.3d 706 (2001); *Wilson v. State*, 332 Ark. 7, 962 S.W.2d 805 (1998). We affirm a conviction if substantial evidence exists to support it. *Carmichael v. State*, 340 Ark. 598, 12 S.W.3d 225 (2000); *Willett v. State*, 335 Ark. 427, 983 S.W.2d 409 (1998). Substantial evidence is that evidence which is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other, without having to resort to speculation or conjecture. *Haynes v. State, supra*; *Thomas v. State*, 312 Ark. 158, 847 S.W.2d 695 (1993). In determining the sufficiency of the evidence, this court will not second-guess credibility determinations made by the factfinder. *Hale v. State*, 343 Ark. 62, 31 S.W.3d 850 (2000); *Pyle v. State*, 340 Ark. 53, 8 S.W.3d 491 (2000); *McCoy v. State*, 325 Ark. 155, 925 S.W.2d 391 (1996).

A criminal defendant's intent or state of mind is rarely capable of proof by direct evidence and must usually be inferred from the circumstances of the crime. *Green v. State*, 330 Ark. 458, 956 S.W.2d 849 (1997). Circumstantial evidence may provide the basis to support a conviction, but it must be consistent with the defendant's guilt and inconsistent with any other reasonable conclusion. *Whitfield v. State*, 346 Ark. 43, 56 S.W.3d 357 (2001); *Engram v. State*, 341 Ark. 196, 15 S.W.3d 678 (2000); *Bangs v. State*, 338 Ark. 515, 998 S.W.2d 738 (1999). Because of the obvious difficulty in ascertaining a defendant's intent or state of mind, a presumption exists that a person intends the natural and probable consequences of his acts. *Leaks v. State*, 345 Ark. 182, 45 S.W.3d 363 (2001); *Harmon v. State*, 340 Ark. 18, 8 S.W.3d 472 (2000).

The offense of second-degree murder is defined as follows:

(a) A person commits murder in the second degree if:

(1) he knowingly causes the death of another person under circumstances manifesting extreme indifference to the value of human life[.]

Ark. Code Ann. § 5-10-103(a)(1) (Repl. 1997). The culpable mental state of acting "knowingly" is defined in the Criminal Code:

(2) A person acts knowingly with respect to his conduct or the attendant circumstances when he is aware that his conduct is of that nature or that such circumstances exist. A person acts knowingly with respect to a result of his conduct when he is aware that it is practically certain that his conduct will cause such a result[.]

Ark. Code Ann. § 5-2-202(2) (Repl. 1997).

■ With regard to whether Price acted knowingly, the State bottoms its argument that he did so on the jury's credibility determination regarding the different versions of events presented at trial. At trial, Julia Sellers testified that the altercation leading to Sykes's death began when Price came out of the club, gun in hand, and walked very rapidly and angrily toward Sykes. She stated that Price then grabbed Sykes's shirt, pointed the gun to his head, stared at him for a few seconds, and then fired the gun. This testimony is sufficient circumstantial evidence of Price's mental state to uphold his conviction. The jury was free to believe or disbelieve Sellers's testimony, and it chose to believe it. *See Chapman v. State*, 343 Ark. 643, 38 S.W.3d 305 (2001); *Bell v. State*, 334 Ark. 285, 973 S.W.2d 806 (1998) (noting that this court does not weigh the credibility of witnesses). Sellers and Price, of course, gave different versions of what happened. Under our standard of review, however, we view the evidence in the light most favorable to the State and consider only the evidence that supports the verdict. *Williams v. State, supra.*

■ With regard to whether Price acted under circumstances manifesting an extreme indifference to human life, this court has held that the mere act of pointing a loaded gun at another person in the course of a robbery is a manifestation of extreme indifference to the value of human life. *Isbell v. State*, 326 Ark. 17, 931 S.W.2d 74 (1996). In *Isbell*, we stated that this act of pointing the weapon was sufficient to constitute the requisite circumstances regardless of

whether there was an actual intent to shoot. *Isbell*, 326 Ark. at 26, 931 S.W.2d at 80. In the instant case, Price pointed a loaded gun at the victim's head during an argument. That act alone decides the issue of whether Price acted with extreme indifference to the value of human life. We affirm the circuit court on this point.

## II. New Trial Motion

Price's second point is that the circuit court erred in refusing to grant him a new trial. Price raises five grounds in support of his contention: (1) Oliver's representation of Price was compromised by a conflict of interest; (2) Oliver was ineffective in withdrawing the motion to sever the second-degree murder charge from the felon-firearm charge; (3) Oliver was ineffective in allowing Price to testify at trial; (4) the racial composition of the *venire* was a denial of Price's due process rights; and (5) Oliver was ineffective in failing to pursue the racial-composition issue before *voir dire* commenced.

### a. Conflict of Interest

Price urges that Oliver's election to the office of Garland County prosecuting attorney on November 7, 2000, created a material conflict of interest during Price's trial, which began on November 20, 2000. He points to several specific incidents which, he asserts, illustrate that conflict. First, Oliver told the jury panel about his recent election during *voir dire*. As a result, Price argues, Oliver lost credibility with the jury as a defense attorney, because Oliver ran his campaign for prosecutor on a law-and-order platform of aggressive prosecution. Oliver also tried the case against a deputy prosecuting attorney, Dan Turner, who was to become his employee in less than two months. Finally, Price contends that Oliver was on a tight schedule to wind down his practice by January 1, 2000, when he would take office as prosecutor. For this reason, Price claims that Oliver did not pursue his September 11, 2000 motion to sever the offenses but instead bargained with the deputy prosecutor to withdraw the motion if the deputy prosecutor agreed not to oppose Oliver's motion for a continuance. In essence, Price contends that Oliver's representation was materially compromised by his political campaign and by his status at trial of prosecutor-elect.

The State responds that Price waived any conflict of interest that Oliver may have had when he continued to allow Oliver to represent him after learning of Oliver's decision to seek the office

and his subsequent election. Price replies that if there was any waiver, it was not intelligently made. He notes that Oliver did not explain the conflict to him as such, but rather told him that he was planning to seek the office of prosecuting attorney. Also, Price notes that he received no outside legal advice on the conflict. He adds that he had no way of knowing the niceties of the adversarial process and any breakdown of that process that might occur due to Oliver's recent election victory.

Prejudice will be presumed from a counsel's conflict of interest only when the defendant demonstrates that counsel actively represented conflicting interests. *Cuyler v. Sullivan,* 446 U.S. 335 (1980); *Johnson v. State,* 321 Ark. 117, 900 S.W.2d 940 (1995). In *Cuyler,* the United States Supreme Court set forth the applicable standard for assessing whether a conflict of interest gives rise to presumptive prejudice:

> [A] defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief. But until a defendant shows that his counsel *actively represented conflicting interests,* he has not established the constitutional predicate for his claim of ineffective assistance.

*Cuyler,* 446 U.S. at 348-50 (citing *Holloway v. Arkansas,* 435 U.S. 475 (1978); *Glasser v. U.S.,* 315 U.S. 60 (1942)) (emphasis added). The adverse effect on counsel's performance must be real and have a demonstrable detrimental effect, and not merely have some abstract or theoretical effect. *McCuen v. State,* 328 Ark. 46, 941 S.W.2d 397 (1997); *Johnson v. State, supra; Simmons v. Lockhart,* 915 F.2d 372 (8th Cir. 1990). A defendant is not entitled to relief under the *Cuyler* test unless he satisfies both the conflict and deficient performance prongs of the test. *Johnson v. State, supra; Salam v. Lockhart,* 874 F.2d 525 (8th Cir. 1989) (citing *Lightborne v. Dugger,* 829 F.2d 1012 (11th Cir. 1987)). The defendant bears the burden of proving a conflict of interest on the part of his counsel as well as deficient performance. *Johnson v. State, supra; Dumond v. State,* 294 Ark. 379, 743 S.W.2d 779 (1988).

To demonstrate a conflict of interest, Price points to (1) Oliver's lack of credibility with the jury due to his election as prosecutor, (2) his decision not to pursue the motion to sever the two charges, and (3) the fact that he would soon be the deputy prosecutor's boss. We disagree that these facts rise to the level of sufficient proof of a material conflict of interest under *Cuyler v. Sullivan, supra.* But, more importantly, Price was aware of Oliver's status as a

political candidate and prosecutor-elect throughout his representation, but never complained of those circumstances.

 It is clear under our caselaw that a criminal defendant is able to waive his attorney's conflict of interest. *Lee v. State*, 343 Ark. 702, 38 S.W.3d 334 (2001) (conflict waived when circuit court elicited express waiver on the record in open court); *Myers v. State*, 333 Ark. 706, 972 S.W.2d 227 (1998) (conflict waived when appellant was informed of the conflict and voluntarily proceeded with his retained counsel). However, we have said that any waiver of the Sixth Amendment right to counsel must be made knowingly, intentionally, and voluntarily. *Murray v. State*, 280 Ark. 531, 659 S.W.2d 944 (1983).

In *Murray v. State, supra*, the circuit court held that a valid waiver had taken place in the context of joint representation of a husband and wife. This court recited the pertinent facts:

> Appellant's trial attorney . . . had represented appellant and his wife in other criminal and civil matters for a period of four years. No conflict had surfaced during that time. Appellant and his wife both retained the attorney and both paid him out of a joint bank account. The attorney and appellant appeared at a hearing on December 17, 1980, and appellant mentioned no possible conflict. They conferred at other times and there was no mention of a conflict.
>
> . . . .
>
> During the trial there was neither objection, nor claim, nor notice to the court of any potential conflict. The alleged conflict was not mentioned until the post-conviction proceeding was commenced on December 20, 1982, over 17 months after the trial.

*Murray*, 280 Ark. at 531, 533, 659 S.W.2d at 945. We went on to hold that Murray "knew of the alleged conflict, intentionally did not disclose it and voluntarily proceeded with his retained counsel. 'Appellant cannot now, after knowingly completing the trial with such counsel, urge that he was prejudiced.' " *Id.* at 534, 659 S.W.2d at 946 (quoting *United States v. James*, 505 F.2d 898 (5th Cir. 1975)).

 It is clear to this court that Price was well aware of Oliver's status both before and after the election. Oliver testified at the new-trial hearing that he had visited with Price about being prosecutor-elect, and Price had no objection to his representation.

Indeed, they agreed that having a prosecutor-elect as defense counsel could well be a selling point before the jury. And, of course, Price was present when Oliver told the jury panel that he was prosecutor-elect during *voir dire*. Still, Price voiced no objection. We hold that an actual conflict of interest was not shown by Price, but even if it had been, that he waived it.

*b. Ineffective assistance of counsel*

██ ██ We turn next to Price's assertion that Oliver was ineffective as his counsel. In conducting our analysis of ineffective counsel, we turn to *Strickland v. Washington*, 466 U.S. 668 (1984), which sets forth the appropriate standard:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland*, 466 U.S. at 687; *see also Hill v. State*, 347 Ark. 441, 65 S.W.3d 408 (2002); *Williams v. State*, 347 Ark. 371, 64 S.W.3d 709 (2002); *Sanford v. State*, 342 Ark. 22, 25 S.W.3d 414 (2000). Thus, a defendant must first show that counsel's performance fell below an objective standard of reasonableness and then that counsel's errors actually had an adverse effect on the defense. *Sanford v. State, supra*; *Peebles v. State*, 331 Ark. 188, 958 S.W.2d 533 (1998).

██ In our review, this court indulges in a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Peebles v. State, supra*; *Wainwright v. State*, 307 Ark. 569, 823 S.W.2d 499 (1992). The defendant claiming ineffective counsel has the burden of overcoming that presumption by identifying the acts and omissions of counsel which, when viewed from counsel's perspective at the time of trial, could not have been the result of reasonable professional judgment. *Wainwright v. State, supra*. The petitioner must show that there is a reasonable

probability that, but for counsel's errors, the factfinder would have had a reasonable doubt respecting guilt and that the decision reached would have been different absent the errors. *Thomas v. State*, 322 Ark. 670, 911 S.W.2d 259 (1995). We have held that the issue of ineffective counsel may be raised on direct appeal, when it has been raised in a motion for a new trial. *Missildine v. State*, 314 Ark. 500, 863 S.W.2d 813 (1993).

 The principle that a defendant should start a criminal trial with a clean slate and not with the black mark of a felony conviction is one that has been often stated by this court. *See, e.g., Elliot v. State*, 335 Ark. 387, 984 S.W.2d 362 (1998); *Sutton v. State*, 311 Ark. 435, 844 S.W.2d 350 (1993). In *Elliot*, the prosecutor had referred to a prior conviction in opening statement, and we said: "Thus, from the commencement of the State's case, the State labeled Elliot a habitual criminal, thereby removing one of the constitutional benefits afforded all defendants in a criminal case — a right to a fair and impartial jury." *Elliot*, 335 Ark. at 392, 984 S.W.2d at 365. We reversed the conviction. In *Sutton*, we held that the defendant was entitled to a new trial due to the failure of the circuit court to sever a felon-firearm charge from first degree murder. We said in those circumstances: "Where a felon/firearm charge is tried with a second felony, the jury is confronted at the opening of the trial with the stark and highly significant fact that the defendant is a convicted felon." *Sutton*, 311 Ark. at 440, 844 S.W.2d at 353.

In the case before us, Price contends that prejudice accrued in his trial and that Oliver was ineffective in not pursuing the motion to sever. Oliver conceded at the hearing on the new-trial motion that if he had pursued the motion for severance, it would have been granted. However, he also testified that the reason why he did not pursue the motion was because he discussed the matter with Price "several times," and they agreed to try the two cases together and "go for it." Moreover, Oliver stated that they weighed the fact that if the cases were severed, the felon-firearm charge would have been tried first and Price would have been convicted. This meant that the jury would have learned of this new conviction during the sentencing phase of the second-degree murder trial, and if Price took the stand during the guilt phase, at that time also by way of impeachment. The new conviction would also have been added to his prior convictions for enhancement purposes. Thus, it was Oliver's contention that these factors counterbalanced the prejudice arising from a joint trial of the two charges.

██ While the fact that Oliver did agree with the prosecutor to withdraw his motion to sever in exchange for the prosecutor's agreement not to oppose his motion to continue the trial raises suspicions in Price's eyes, we do not agree that it automatically amounts to ineffective counsel. We said in *Sutton v. State, supra,* that we were disinclined to conclude that a joint trial of a felon–firearm charge with a second charge constituted prejudice in all instances. 311 Ark. at 441, 844 S.W.2d at 354. And as Oliver points out, had the severance been successful, this could have caused additional problems under the scenario described above. Oliver testified that he discussed the pros and cons of severance with Price and that they agreed to gamble on one trial. This falls within the category of a tactical decision, and we do not reverse on grounds of ineffective counsel when the decision was based on strategy. *Williams v. State,* 347 Ark. 371, 64 S.W.3d 709 (2002); *Dunham v. State,* 315 Ark. 580, 868 S.W.2d 496 (1994).

Price, of course, maintains that he would not have taken the stand at the second–degree murder trial but rather would have relied on his statement to police officers to tell his story. Thus, he claims that he would not have been impeached by the new felon–firearm conviction. This directly contradicts Oliver's testimony, however, and we question whether Price would, indeed, have foregone testifying when his defense was accidental homicide.

We affirm the circuit court on this point.

*c. Price as a witness*

Price's third point regarding ineffectiveness focuses on his taking the stand during his case-in-chief. Price asserts that Oliver advised him to take the stand, and that this constituted deficient performance under *Strickland* which led to prejudice.

██ We have held that a criminal defendant has the right to choose whether to testify in his own behalf. *Dansby v. State,* 347 Ark. 674, 66 S.W.3d 585 (2002); *Robinson v. State,* 295 Ark. 693, 751 S.W.2d 335 (1988). Counsel may only advise the defendant in making the decision. *Watson v. State,* 282 Ark. 246, 667 S.W.2d 953 (1984). Hence, the decision to testify is purely one of strategy. *Dansby v. State, supra; Isom v. State,* 284 Ark. 426, 682 S.W.2d 755 (1985).

■ Oliver's representation could not be deficient when Price's decision to testify was ultimately his own. We affirm on this point as well.

### III. Racial Composition of the Panel

Price next contends that the racial composition of the *venire* violated his right to due process. His argument is really in two parts. First, he challenges the *venire* directly, and, next, he argues that Oliver was ineffective in not raising the issue before *voir dire*.

■ Selection of a petit jury from a representative cross-section of the community is an essential component of the Sixth Amendment right to a jury trial. *Danzie v. State*, 326 Ark. 34, 930 S.W.2d 310 (1996); *Davis v. State*, 325 Ark. 194, 925 S.W.2d 402 (1996). It is axiomatic that the prosecutor may not deliberately or systematically deny to members of a defendant's race the right to participate, as jurors, in the administration of justice. *Davis v. State, supra*; *Sanders v. State*, 300 Ark. 25, 776 S.W.2d 334 (1989). In order to establish a *prima facie* case of deliberate or systematic exclusion, a defendant must prove that: (1) the group alleged to be excluded is a "distinctive" group in the community; (2) the representation of this group in *venires* from which the juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) this underrepresentation is due to systematic exclusion of the group in the jury-selection process. *Duren v. Missouri*, 439 U.S. 357 (1979). In *Davis v. State, supra*, however, we said: "We have noted in particular where proof of a systematic exclusion of the distinctive group is completely lacking, there is no basis for a motion to quash the jury panel." 325 Ark. at 196, 925 S.W.2d at 404. The same holds true in the instant case. Price submitted no statistical evidence in support of his motion that systematic exclusion occurred. We affirm the circuit court's ruling denying Price's motion to quash.

■ ■ At his hearing on his motion for a new trial, Price, with his new counsel, also offered no statistical evidence regarding the racial composition of any body relevant to the *venire* such as the Garland County population, registered voters in Garland county, or the *venire* itself. Nor did he allege how the argued systemic exclusion had taken place. But, in addition, as the State points out, at the posttrial hearing, Price failed to obtain a ruling from the circuit court on the issue that Oliver was ineffective in raising the question of racial composition of the *venire* after *voir dire* rather than before.

 Regardless of the timing of Oliver's motion to quash, the motion still would have been denied. This court has said:

> Under Ark. Code Ann. § 16-32-103 (Repl. 1994), the jury *venire* is chosen at random by computer selection from voter registration lists. This court has frequently upheld this process and has stated that it guarantees that there can be no purposeful exclusion of African-Americans. *See, e.g., Lee v. State,* 327 Ark. 692, 942 S.W.2d 231 (1997). We have also noted that "[w]hile it is clear that juror selection may not be the result of discrimination against groups defined by race, color, creed, or sex, the Supreme Court has made it equally clear that this does not mean that each jury must have on it persons representative of each distinctive group in the population from which it is chosen." *Mitchell v. State,* 299 Ark. 566, 568, 776 S.W.2d 332, 333 (1989).

*MacKintrush v. State,* 334 Ark. 390, 405, 978 S.W.2d 293, 300 (1998). Given the multiple decisions from this court upholding the method by which a *venire* is randomly selected, we cannot say that prejudice accrued to Price on this ground, absent some evidence of systematic exclusion. Neither Oliver nor Price's new attorney, Louis Etoch, presented any proof in this regard. Accordingly, Oliver's performance was not deficient in this regard. The circuit court did not err in denying Price a new trial on this ground.

Affirmed.